# Frederick Collins *et al.*

## *v.*

# William B. Hayte.*

1. Evidence—*in suits for malicious prosecution.* Where a party gives notice to the authorities of an alleged criminal offense, and a prosecution is instituted thereon, and fails, in an action against him for malicious prosecution, he ought to be allowed to go into an examination of all the facts and circumstances attending the case, in order to his own justification. In such action the *onus* of proof of probable cause being upon the defendant, he should not be closely circumscribed in his efforts to that end, but should be allowed great latitude of inquiry.

2. In this case, the prosecution complained of as being malicious, was instituted by the proprietors of a foundry wherein the operatives were journeymen and apprentices employed contrary to the rules of an organization called the "Moulders' Union." Certain persons connected with that "Union," conspired to entice away the apprentices, and to interfere with the prosecution of the business of their employers; the latter commenced an action on the case against the alleged conspirators, and sued out a capias therein, on which the parties were arrested and held to bail, after which the suit was dismissed by the parties bringing it, without being brought to a trial. One of the parties so arrested thereupon instituted this suit for the alleged malicious prosecution, in respect thereto: *Held,* in the latter suit, when a witness for the plaintiff was introduced to exonerate him as one of the conspirators, that it was competent to show, on the cross-examination of such witness by the defendants, that he had become a member of the "Union" after he left the defendants' employment; although it did not technically pertain to the matter of the direct examination, it was admissible as showing the influences under which the witness was placed, by joining the "Union."

3. So it is competent in such a case, for the defendants to prove what was the object of a meeting of their employees, which was attended by the plaintiff, and to ask if such meeting was not held at the place of meeting of the "Moulders' Union." As it was sought to show a conspiracy by the members of that "Union," such an inquiry was proper as tending to that end.

4. It would also be competent for the defendants to prove whether the apprentices made any complaints before the "strike," and what connection the plaintiff

---

*This and the following case, decided at the January term, 1868, were necessarily omitted from their proper place in the reports of that term.

22—50th Ill.

had with such complaints, and all questions would be allowable which would have a tendency to show the improper action of defendants' employees was by reason of the officious intermeddling of the plaintiff and others.

5. MALICIOUS PROSECUTION—*of the advice of counsel.* In an action for an alleged malicious prosecution and arrest, under process in a civil action, it is competent for the defendant to prove by his attorney what opinion the latter gave him as to his right of action and arrest of the plaintiff, and it is improper to limit the inquiry as to whether the attorney advised the suit to be brought.

6. Bringing an action after taking competent legal advice that a right of action exists, will, in most cases, relieve it from the charge of having been brought maliciously and without probable cause.

APPEAL from the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

This was an action on the case, brought in the court below, by William B. Hayte, against Frederick Collins, Allen Comstock, Enoch Comstock, Timothy H. Castle and Charles H. Winn, for an alleged malicious prosecution, arrest and imprisonment.

The declaration alleges that on the 2d of July, 1866, the defendants, maliciously and without probable cause, instituted an action on the case against the plaintiff and five others, suing out a capias in said action, and caused bail in the sum of $50,000 to be endorsed thereon by the clerk, and the plaintiff to be arrested on said capias and imprisoned for the space of six hours, until he gave bail on said capias; that the defendants failed to prosecute their suit with effect, and dismissed it at the March term, 1867, making the usual averments as to pain of body and mind, hindrance of business, loss of credit, expenses of defense, &c.

The defendants pleaded not guilty.

The various questions arising in regard to the admissibility of evidence, will best be understood by recurring to the facts out of which the original prosecution against the plaintiff arose. Those facts, as they are alleged to have existed, are presented in the affidavit of one of the defendants, upon which the capias issued in that proceeding, as follows:

That on June 27th, 1866, the plaintiffs (in that suit) were, and for four years had been, manufacturing stoves, &c., at a foundry in Quincy, and then had in their employment in said business, a large number of employees, whose names were set forth, working for them under printed and written contracts, of various dates, then having considerable length of time to run, by which contracts the employees were bound to work for plaintiffs and learn the trade of moulding, for certain terms specified in the contracts, the plaintiffs agreeing to cause the employees to be instructed in moulding in the best manner, furnish them employment, and pay them certain specified wages.

That at the time of the alleged enticement of the said employees, these contracts were in full force, and plaintiffs had fully complied with them. Refers to a schedule annexed, as setting forth names of employees, terms of service, rate of wages, unexpired terms of service, estimated average weekly value of each employee's service during his unexpired term, and estimated excess of such value over the wages stipulated in the contracts. That the employees, when they began work, were wholly unskilled in moulding; that they had already acquired considerable skill, and would have continued to improve during their unexpired terms, and the values assigned to their weekly services in the schedule, are an average estimate, founded upon the ordinary and usual progressive increase in skill and efficiency, as shown by experience in like cases; that, estimating the value of their services for the unexpired terms at what they were worth at the time they were enticed away, the aggregate would be at least $25,000 over and above the wages stipulated in the contract.

That on or about the 27th day of June, A. D. 1866, John Keho, Henry B. Carter and Edward Malone, (who had been journeymen in the foundry for a few days prior thereto,) together with Samuel Wood, William B. Hayte and John C. Fisher, (who were not connected with the foundry,) combining and confederating themselves together, of their fraud and

malice, to deprive affiant and said Frederick Collins, Allen Comstock, Enoch Comstock and Charles H. Winn, of the services of their said employees, and to injure, break up and destroy their said manufacturing business, did unlawfully, &c., entice, persuade and procure all of said employees in said schedule mentioned (being then and there engaged in the service aforesaid, under the contract aforesaid,) to depart from and out of the said service and employment of the said Frederick Collins, &c., and to wholly abandon said service, by means of which enticement, procurement and persuasion, the said employees, afterwards, and on the 27th day of June, A. D. 1866, unlawfully, &c., and without the assent of said Frederick Collins, &c., departed from and out of their said service and employment, and have ever since remained, and still do remain absent from said service and employment, and have wholly refused to return into their said service and employment, and have wholly abandoned their said contracts, and refuse to be further bound by or to comply with the same, whereby said Frederick Collins, &c., have wholly lost the benefit of said contracts, and of the services of their said employees, and sustained damage to the amount of $25,000, at the lowest computation, and said damage, in the ordinary course of business, would amount to a much larger sum.

That the employees so enticed away, constituted almost the entire force of hands at the foundry, and that the business had thereby become necessarily wholly suspended.

That the business requires the regular service of skilled employees, who are very difficult to obtain without great effort and long space of time, laborers skilled in the trade being scarce in the United States, and particularly in the west; that the business requires a large outlay in buildings, material, &c., which are of little value compared to their cost, except in the continued and regular use of the same ; that the expenditure and outlays of plaintiffs have been over $100,000, whereby and by means of said employees the same hath become an extensive business, and profitable, in an amount

not less than $200,000 per annum, which, by means of the premises, is destroyed; that said employees have been collected, instructed and prepared for such services with a view to said business and outlay, by great diligence, expense, and long efforts, and for such sole purpose, and that the damage reasonably and necessarily resulting from the stoppage, delay and hindrance of the said business is not less than $25,000.

That said Frederick Collins, &c., are about to commence a suit, and that there is danger that the judgment will be lost unless the parties are held to bail.

A schedule attached to the affidavit, contains the names of 34 employees, their unexpired terms ranging from 34 weeks to 900 days; weekly wages ranging from $5 to $8; the weekly value of their services ranging from $15 to $23; and the excess in value of the unexpired terms, over the stipulated wages, being estimated in the aggregate at $37,640.

A capias was issued upon this affidavit, against Hayte and the other alleged conspirators, upon which bail was endorsed to the amount of $50,000. Hayte was arrested under the capias, and after remaining in jail about two hours he was taken before a Circuit Judge, upon *habeas corpus*, gave bond for his appearance before the judge the next morning, when, after a hearing, he was again confined in jail about two hours, and then released upon bail of $10,000. This arrest was made in July, 1866. At the October term following, the cause was continued, and at the March term, 1867, it was dismissed by the plaintiffs therein. Those are the proceedings upon which this action for malicious prosecution was brought by Hayte.

On the trial below, the plaintiff, Hayte, introduced several witnesses who had been in the employment of the defendants in their foundry, and examined them in relation to the apprentices of the defendants leaving their establishment, and the cause of their doing so, and in relation to a "strike" among the employees generally, of the defendants.

One of those witnesses, *Smeiderkamp*, stated, on his examination in chief, that a meeting was held by those engaged in the "strike," and a paper prepared, setting forth the terms they demanded from the defendants, and a committee was appointed, of which the witness was one, to present that paper to one of the defendants. The object of the "strike," was, as avowed by this witness, to prevent any more apprentices being taken into defendants' foundry, and to raise the wages of journeymen.

On the cross-examination, the defendants' counsel propounded to the witness the following questions: "Have you joined the Moulders' Union?" "When did you join the Moulders' Union?" "Were you or were you not, during the time of the strike, told by some of the members of the Moulders' Union, that if you would then join the Moulders' Union, it would save you $300?" These questions were severally objected to, on the ground that they were not pertinent to the matter of the direct examination, and the objection was sustained, to which the defendants excepted.

The witness then stated that the committee waited on Comstock, one of the defendants, with the paper mentioned, but that he did not look at it. The defendants' counsel asked him, "Did or did not that paper require Mr. Comstock to agree to different wages for the apprentices?" Objected to, as not pertinent to the matter of the direct examination, and objection sustained.

The witness proceeded: "When the paper was presented, Comstock wanted to talk with us apprentices, by ourselves. We wouldn't do that; we were ordered not to talk unless the whole committee were present."

Question by defendants' counsel: "Before the strike, were you, or not, followed and insulted by members of the Moulders' Union, for being an apprentice?" Objected to, as not pertinent to the matter of the direct examination. Objection sustained; exception by defendants.

"The meeting of which I have spoken, was a meeting of the boys and jours of the shop. It was not after the strike; it was before the strike. We boys had made up our minds to do what we had done; but we got up the meeting to get us all together. We had previously determined to strike. I think we worked the day previous to the meeting. The object of the meeting was to get up a proposition to make to defendants. Wood was there; Fisher was not. Comstock & Co. afterwards agreed to a paper similar to the one we presented to Allen Comstock."

*Malring*, another witness for the plaintiff, on his cross-examination by the defendants, was also asked: "Have you joined the moulders' union?" and "When did you join the moulders' union?" These questions were objected to as not being pertinent to the matter of the direct examination, and the objection sustained.

The witness had stated, on his direct examination, that he was one of defendants' apprentices at the time of the "strike," and that he did not think Hayte persuaded the boys to leave.

*Carter*, who was also an employee of defendants, was a witness for the plaintiff, and his testimony tended to exonerate Hayte from any connection with the strike or the conspiracy. On his cross-examination, the defendants' counsel asked him: "Did you, during the strike, or immediately afterwards, join the moulders' union?" and "Were any of the apprentices named in the affidavit of Castle, taken into the moulders' union about the time of the strike?" Objections were sustained to these questions, on the same ground as the others.

Much testimony was introduced by the defendants, to show a conspiracy to injure the establishment of the defendants, and to induce their apprentices to leave them, for the reason that the defendants conducted their foundry on the "free" system, and not subject to the rules of the "moulders' union," and the evidence tended to connect Hayte, the plaintiff, with that conspiracy.

*Charles Pfeiffer*, examined for the defendants, testified: "At the time of the strike in defendants' foundry, my brother was security on the contract of one of the apprentices. I was at a meeting at No. 4 engine house; I think Hayte was there. I know Hayte said something to the apprentices. Wood was there. Wood said the boys should go back to work again. Hayte said Comstock had broke his word so often that they could not believe him. At that meeting Joseph Lopaz stated that Comstock had agreed not to take any more apprentices. Wood said, 'then the boys may go back.' Hayte said Comstock had broke his word so often that he couldn't trust him. The house was crowded."

Question by defendants' counsel: "What did you learn at that meeting was the object of the meeting?" Objected to. Objection sustained; exception by defendants.

"At this meeting, Wood, Hayte and Castle made speeches. Hayte was participating in the meeting. From Hayte and others' talk, I learned that the object of the meeting was to prevent Comstock taking more apprentices. What Hayte said was in his speech. The apprentices were then on a strike."

Question by defendants' counsel: "Was, or was not, this meeting held at the place of meeting of the moulders' union?" Objected to. Objection sustained; exception by defendants' counsel.

Cross-examined:

"This meeting was held in the upper story of the engine house. Lopaz, Conyers and Worth were there. This is the only meeting I attended."

Re-examined:

"Others beside Hayte, at that meeting, made the remark, 'not to go back.' It was a general remark through the meeting."

Similar questions were propounded to Lopaz, another of defendants' witnesses, and ruled out by the court.

*S. H. Emery*, examined for the defendants: "Have been in defendants' employ 11½ years. Remember the strike in

1866. The men named in the schedule of Castle's affidavit were all in defendants' employ at the time of the strike. They all struck. For eight years a portion of my business has been at defendants' foundry. I was clerk at foundry, counted work, shipped, sometimes had general charge of it."

Questions by defendants' counsel . "State whether there was any complaint among the apprentices before the strike ?" Objected to, for the reason, among others, that "said question was not admissible unless defendants proposed to connect Hayte with the complaints." Objection sustained; exception by defendants.

"Had there, or had there not, been any dissatisfaction expressed among the hands in the foundry of defendants, before the strike ?" Objected to, for the same reason as the last preceding question. Objection sustained; exception by defendants.

"I saw Mr. Hayte at the steamboat landing when I went there with Comstock to receive a man who was coming to work for us. I thought Hayte tried to get access to the man. Hayte was stationed at the levee at that time; Fisher was with him. I saw Hayte, and I believe Fisher, standing on the levee when the steamboat landed; I did not see Hayte do anything. I have seen Hayte around the foundry of defendants, and once, at least, inside of it; I told him my instructions were to request him to stay out of there; he went out. This was in 1864, before I learned of his getting in at the window. I have often seen him around the foundry in the morning, about the commencement of work hours."

Questions by defendants' counsel : "State whether or not the boys were operated upon by fear, during the strike ?" "Were the apprentices over-worked, or not ?" "Were, or were not, the boys paid more than the prices mentioned in their indentures ?" "State whether at the time of the strike, or for a long period before that, any floor-rent had been charged ?" Which were objected to, as leading and irrelevant, and objection sustained.

Cross-examined :

" I once saw Hayte standing on the levee with Fisher, in 1864. Never saw Hayte at the foundry but once ; he said he wanted a fish-pole ; I sent and got it for him."

*William McElfrish,* examined for defendants : " I live in Quincy. Have worked for defendants as a moulder. (Plaintiff's counsel here admitted that Hayte was a member of the moulders' union in 1866.) I had a good many conversations with Hayte in 1864. I can't positively say that Hayte ever told me he was in the employ of the moulders' union. To the best of my recollection, what Hayte told me was, that he was employed to state the truth as to the moulders' union— not precisely to prevent men from going to work for defendants. I was employed at that time in the store of Mr. Roberts, near the depot and steamboat landing."

Question by defendants' counsel : " When did you cease to be a member of the moulders' union ?" Objected to, as irrelevant. Objection sustained ; exception by defendants.

" I can't tell what Hayte said as to what wages he got from the union. He was employed in that way perhaps a month, and perhaps two months. I don't think I saw him more than two or three times while he was so employed."

. Question by defendants' counsel : " What object or purpose was there in employing Mr. Hayte for the service of which you have spoken ?" Objected to. Objection sustained ; exception by defendants.

" Hayte may have said to me that he would battle Comstock on the principle. I don't know whether the union men made any threats. I suppose a part of Hayte's object was to prevent the defendants from getting journeymen to instruct their apprentices, but I do not know what his object was."

Question by defendants' counsel : " Was, or was not, Hayte hostile to the apprentice system ?" Objected to, as leading and irrelevant. Objection sustained ; exception by defendants.

*Nehemiah Bushnell,* examined for defendants : " I am a practicing lawyer ; have practiced as an attorney for thirty

years.  I was one of the counsel for the present defendants in their suit against Wood, Hayte and others mentioned in the declaration in this case.  They stated to me the facts in the case before we brought the suit."

Defendants' counsel then propounded the following question to the witness :  " Upon their stating the facts in that case to you, what opinion, if any, did you give them as to their right to maintain that suit, and to cause the defendants in that suit to be arrested ?"   To which question the plaintiff's counsel objected, and stated to the court, at the time, that they made no controversy about the fact that the witness did advise the bringing of the said suit, and then asked the court not to allow the said question to be answered by the witness ;  and the court thereupon did sustain the objection, and refused to permit the witness to answer the said question ; to which opinion and decision of the court the defendants at the time excepted. The court at the same time offered to allow the witness to answer whether he did advise the bringing of the said suit, and if so, to state it ; but the counsel for the defendants then and there declined to accept of said offer.

The defendants' counsel then propounded the following question to the witness :  " What advice did you give the defendants in relation to bringing that suit, and having the defendants arrested ?"   To which question the plaintiff's counsel objected, and asked the court not to permit the witness to answer the same, and the court sustained the said objection, and refused to permit the witness to answer the same ; and the court at the same time offered to permit the witness to answer whether he had advised the bringing of the said suit, and if so, to state the advice given ; but the defendants' counsel then and there declined to accept said offer ; to which opinion and decision of the court, in sustaining the said objection, and refusing to permit the witness to answer the same, the said defendants, by their counsel, at the time of the giving of said opinion and decision, excepted.

This portion of the testimony given on the trial, presents the questions arising in the case, as to the propriety of the rulings of the court below in regard to the admissibility of testimony sought to be introduced by the defendants.

The jury returned a verdict for the plaintiff, assessing his damages at $661, for which judgment was rendered. The defendants thereupon took this appeal.

Mr. N. BUSHNELL, Messrs. SKINNER & MARSH and Messrs. WHEAT & MARCY, for the appellants.

Mr. JACKSON GRIMSHAW and Messrs. WARREN & WHEAT, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

We have confined our attention chiefly to the three errors first assigned by appellants, which are as follows: Excluding legal and proper evidence offered by appellants, and in sustaining objections to legal and proper questions put by appellants; refusing to permit appellants to propound to witnesses at the trial, legal and proper questions, and in refusing to permit proper questions put to witnesses by appellants to be answered; permitting appellee to put illegal and improper questions to the witnesses, and to give illegal evidence to the jury.

We have looked carefully into the testimony found in the bill of exceptions, and are satisfied that much of the evidence offered by appellants and excluded, should have been received.

The action was case, for a malicious arrest, the plaintiff having been arrested by defendants in an action brought by them against him and others for enticing away their apprentices, which action was dismissed by them, no trial having been had.

The facts briefly are, that appellants were extensively engaged in the iron foundry business at Quincy, employing a

very large capital, and doing a heavy and profitable business under the "free" system, as distinguished from the antagonist system of the "moulders' union." They had at one time in 1864, carried on their establishment under the rules and control of this union, but changed it to a free foundry, and adopted a system of apprenticeship and journeyman work prohibited under the system of the moulders' union. On this change by appellants, the union moulders employed by them quit work, and in June, 1866, all the apprentices of appellants quit their employment.

Appellee being considered, with others, an active instigator of the "strike" by their apprentices, and who belonged to the moulders' union, was prosecuted for his alleged unlawful conduct in enticing away their apprentices, and bail required in a large sum of money, which resulted in his short imprisonment.

· It is in vain to say, when the evidence is considered, that appellee was not actively hostile to appellants' establishment. Many witnesses establish this fact.

That the moulders' union were directly implicated in the attempt to break up appellants' free establishment, is abundantly proved, and that appellee was an active participant therein appears to be well established by the testimony.

This design existing with the moulders' union, it became very important to show that the witnesses for the plaintiff became members of that union after they left appellants, but when the question was asked, on cross-examination, where great latitude is allowed, of a witness if he had joined the moulders' union, the court would not permit the question to be put. In this the court erred, for although it did not, technically, pertain to the matter of the direct examination of the witness, still it was admissible to show the influences under which the witness was placed by joining the moulders' union.

All the questions put to Smeiderkamp, on cross-examination, and rejected by the court, should, on the above principle, have been allowed, and so with Malring and Carter. The refusal

of the court to permit them to answer the questions put on cross-examination was erroneous.

The question put to defendants' witness, Pfeiffer, by the defendants, as to what he learned was the object of the meeting at the engine house, was so applicable to the whole matter in controversy, the witness having stated appellee was at that meeting, that it is difficult to perceive on what ground it was excluded, and so of the question which immediately followed it, and excluded, " Was, or was not, this meeting held at the place of meeting of the moulders' union ?" The objection was not, that the question was leading, but that it was an improper question in itself. We think, as a conspiracy was sought to be proved by appellants by members of this union against them, these questions were very proper, as tending in that direction. So the question put to Lopaz, of the same nature, should have been answered by him, for the reasons given.

This question put to Emery, a witness for defendants, " State whether there was any complaint among the apprentices before the strike," in the view we take of the case, was pertinent, whether appellee was connected with the "complaints" or not. An effort was made by defendants to connect him with the strike, and defendants should have been allowed to show there was really no complaint by the apprentices. The inference would then be a fair one, that they struck by reason of the officious intermeddling and unwarranted conduct of plaintiff and others. All the questions propounded to this witness, which were disallowed by the court, should have been allowed, and the same may be said of those put to McElfrish, who was a member of the moulders' union, and stood in the position of an unwilling witness, with whom great latitude of examination is allowed.

When the nature of the action is considered, the *onus* of proof of probable cause being on the appellants, justice requires they should not be closely circumscribed in their efforts to that end. It is the duty of every citizen, knowing a criminal

offense has been committed, to give notice thereof to the authorities, and if a prosecution is instituted and fails, he ought to be allowed to go into an examination of all the facts and circumstances attending the case, in order to his own justification. Were not this so, but few persons would be found willing to incur the risk of a prosecution against a suspected malefactor, an action for a malicious prosecution to ensue upon his acquittal.

But we do not intend to go into any examination of the proof in this case, as going to show probable cause, but only to state a safe principle, that in such actions great latitude of inquiry is, and should be, indulged.

Another error was refusing to permit Mr. Bushnell, one of appellants' counsel, who had stated that they had consulted him and stated the facts of the case, to answer what opinion he gave them as to their right of action and arrest of appellee. The court would only allow him to be asked if he advised bringing the suit by appellants.

Now it is very apparent this latter question was an impertinent one, so far as Mr. Bushnell, or any other high-minded lawyer, might be concerned, for such lawyers do not advise clients to bring suits. They give them the law on the facts stated. We question very much if Mr. Bushnell ever advised a client to bring an action. The appellants had a right to have the specific question asked of Mr. Bushnell, answered by him—did he advise appellants that they had a right of action, not, did he advise the action brought.

Bringing an action after taking competent legal advice that a right of action exists, will, in most cases, relieve it from the charge of having been brought maliciously and without probable cause. Appellants were entitled to have the precise question put and answered by Mr. Bushnell.

For these errors, the judgment of the circuit court is reversed and the cause remanded.

*Judgment reversed.*