**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1110**

STANLEY JONES,

             Plaintiff - Appellant,

       v.

LANNA CHANDRASUWAN; BRIAN HOLBROOK,

             Defendants - Appellees.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., Chief District Judge.  (1:13-cv-00385-WO-JLW)

Argued:  December 8, 2015           Decided:  April 28, 2016

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge Floyd wrote the opinion, in which Judge Gregory and Judge Duncan joined.

**ARGUED**: S. Luke Largess, TIN, FULTON, WALKER & OWEN, P.L.L.C., Charlotte, North Carolina, for Appellant.  Joseph Finarelli, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.  **ON BRIEF:** Roy Cooper, North Carolina Attorney General, Kimberly D. Grande, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

FLOYD, Circuit Judge:

Appellees Lanna Chandrasuwan (Chandrasuwan) and Brian Holbrook (Holbrook), both North Carolina probation officers, sought Appellant Stanley Jones's (Jones) arrest for allegedly violating conditions of his probation. This case raises questions regarding the application of the Fourth Amendment to the seizure of probationers. The district court granted Appellees' motion for summary judgment on Jones's Fourth Amendment claim, finding that they were entitled to qualified immunity. While we disagree with the district court's discussion at step one of the qualified immunity analysis, we affirm because the right at issue was not clearly established at the time Jones was arrested.

I.

In October 2009, Jones—at the time a teacher and North Carolina resident—was arrested and charged with two counts based on an inappropriate relationship with a student. While the charges were pending, Jones resigned and began working as a salesman for Prime Communications (Prime) in Greensboro, North Carolina. Jones was promoted twice and, in April 2010, transferred to a position with Prime in Augusta, Georgia.

On July 7, 2010, Jones returned to North Carolina and pleaded guilty in state court to two counts of taking indecent

liberties with a student and was sentenced to a minimum of 6 months and maximum of 8 months in prison. The sentence was suspended, and Jones was placed on supervised probation for 24 months. As one of the conditions of his probation, the state court required that Jones pay $471.50 in court costs and fines pursuant to a schedule to be determined by his probation officer. The state court also allowed Jones to transfer supervision of his probation to Georgia if accepted by the Interstate Compact for Adult Offender Supervision (the Compact), an agreement between all 50 states allowing for the transfer of probation supervision of adult offenders between member states.

Under the Compact, the sending state—in this case, North Carolina—retains jurisdiction over the offender for purposes of probation revocation, and the receiving state—in this case, Georgia—supervises probation. Additionally, the sending state is responsible for collecting any financial obligations imposed, and, upon notification from the sending state that the offender is not complying with payments, the receiving state must inform the offender that he is in violation of the conditions of supervision.

The same day he entered his plea, Jones reported to a probation office in Greensboro and met with Judicial Services Coordinator Latonia Williams (Williams). Jones completed an application for transfer of supervision pursuant to the Compact.

3

In the application, Jones agreed to reside at the residence listed until allowed by supervising authorities to change it, to comply with the terms and conditions of supervision placed on him by both North Carolina and Georgia, and that if he did not comply with those terms and conditions, such a failure would be considered a violation of probation and he could be returned to North Carolina. Williams and Jones disagreed about whether he would have to register as a sex offender, which could impact whether Georgia accepted his transfer application. Jones left to see his lawyer and Williams later determined that Jones would not be required to register as a sex offender.

The next day, Jones again met with Williams. Jones and Williams signed a DCC-2 form, which the North Carolina Department of Community Corrections (DCC) uses to set a schedule for payment of financial obligations.[1] However, the DCC-2 form the parties signed was incomplete—it omitted information regarding the payment rate, due date, and the total amount of Jones's financial obligation. This information was apparently omitted because DCC had not yet received the criminal judgment, which is required to establish the parameters of supervision. The DCC-2 form was never completed.

---

[1] While Jones asserts in his affidavit that he did not sign a DDC-2 form, he concedes in his brief that he did, in fact, sign the form.

4

Jones's application for transfer of his probation supervision was approved and Jones arrived in Georgia on July 13, 2010. The next day, North Carolina probation officers forwarded the terms of Jones's sentence to Georgia authorities through the Interstate Compact Offender Tracking System (ICOTS), a system facilitating communications between Compact member states' Compact offices. On July 15, 2010, Jones reported to the Augusta, Georgia probation office. Throughout Jones's residency in Georgia, there were no reported violations of his probation by Georgia authorities. In December 2010, Prime offered Jones a promotion to a position located in Savannah, Georgia. At Jones's request, Georgia probation officers transferred his supervision to a probation office in Savannah.

DCC policy requires that when a probationer is supervised in another state under the Compact, a review is undertaken 180 days before his discharge. In January 2012, DCC employee Jay Lynn (Lynn) conducted this 180-day review and determined that Jones had not paid any of the costs and fines required by the judgment. Lynn informed North Carolina Interstate Compact District Coordinator Karl Waller (Waller) of this and instructed him to confirm it with Holbrook, the chief probation and parole officer in Greensboro. After confirming with Holbrook that Jones had not paid his costs and fines, Waller sent a Compact Action Request on January 25, 2012 to the Georgia Compact office

5

through ICOTS, requesting that Jones be instructed to pay the costs and fines by February 1, 2012. On February 4, 2012, the costs and fines remained unpaid and Waller completed a violation report, which Lynn approved, stating that Jones was in violation of the terms and conditions of his probation.

On February 9, 2012, Jones met with his probation officer in Savannah, who introduced him to the Savannah office's Compact representative. The Compact representative explained that she had received a notice from North Carolina that Jones had failed to pay his costs and fines. Jones indicated that he knew he still owed money, that the sum was due before his probation was terminated in July, and that he would check with his lawyer about arranging for payment. The same day, Waller received two responses to his Compact Action Request. The first stated that Jones had been instructed by his supervision officer to make payment and that Jones was going to contact his lawyer about the amount owed. The second response stated that Jones had been instructed to make his payment and that he stated that he would pay the balance by the end of the month.

On February 15, 2012, Waller returned Jones's probation file to Holbrook for "case management and collection of fines and court costs." J.A. 34. Holbrook forwarded the file to Chandrasuwan—a probation officer under his supervision in the Greensboro office—and instructed her to follow up with Jones.

6

On March 8, Chandrasuwan attempted to contact Jones at two telephone numbers on file, but was unable to reach him. On March 12, Chandrasuwan prepared a violation report recounting that Jones had violated the conditions of his probation by failing to timely pay court costs and fines. The same day, Chandrasuwan attempted to notify Jones by mail of the need to contact her or return to the Greensboro probation office within two weeks to pay the outstanding fine. On March 26, when Chandrasuwan had not heard from Jones, she filed the March 2012 violation report with the clerk of court.

On March 27, Chandrasuwan's correspondence—which was sent to Jones's address in Augusta—was returned. The same day, Chandrasuwan prepared an addendum violation report stating that Jones had absconded and was avoiding supervision. Chandrasuwan and Holbrook reached this conclusion without contacting Compact officials or the Georgia probation office. Also the same day, Chandrasuwan appeared before a magistrate judge in North Carolina state court to secure an order for Jones's arrest based on his multiple probation violations.[2] At the hearing,

---

[2] North Carolina law provides that an order for arrest may be issued when "[a] defendant has violated the conditions of probation." N.C. Gen. Stat. § 15A-305(b)(4). Section 15A-1345(a) provides that "[a] probationer is subject to arrest for violation of conditions of probation by a law-enforcement officer or probation officer upon either an order for arrest issued by the court or upon the written request of a probation (Continued)

7

Chandrasuwan presented the violation report and addendum and the magistrate judge issued an order for Jones's arrest. Jones's file was then transferred to another probation officer to execute the arrest order.

On May 1, the United States Marshals Service arrested Jones at his home in Savannah and he was held in a Georgia county jail. The next day, Jones's wife paid the $471.50 in full. On May 7, Holbrook secured an order dismissing the probation violations and recalling the arrest order and transmitted the order to authorities in Georgia. Jones was released from custody on May 8. In in interim, Prime terminated Jones's employment because he could not work due to his arrest and incarceration. After a period of unemployment, Jones and his family moved back to North Carolina.

In March 2013, Jones filed this action in North Carolina state court, bringing claims for violation of his Fourth Amendment rights under 42 U.S.C. § 1983 and for malicious prosecution under state law. Appellees removed the case to federal court and moved for summary judgment. The district court granted summary judgment in favor of Appellees, finding that they were entitled to qualified immunity. The district

---

officer, accompanied by a written statement signed by the probation officer that the probationer has violated specified conditions of his probation. . . ."

8

court denied supplemental jurisdiction over Jones's malicious prosecution claim and dismissed the claim without prejudice. Jones timely appealed.

## II.

We review a grant of summary judgment de novo. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Bostic v. Schaefer, 760 F.3d 352, 370 (4th Cir. 2014) (citation and internal quotation marks omitted). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (citation and internal quotation marks omitted). "A fact is material if it might affect the outcome of the suit under the governing law." Id. (citation and internal quotation marks omitted). "We are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party . . . ." Id. at 312. In doing so, we must not weigh evidence or make credibility determinations. Mercantile Peninsula Bank v. French, 499 F.3d 345, 352 (4th Cir. 2007). "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary

judgment." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam).

## III.

Section 1983 is not itself a source of substantive rights, but rather provides a method for vindicating federal constitutional and statutory rights. 42 U.S.C. § 1983; Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation omitted). Qualified immunity, an affirmative defense to liability under § 1983, protects all government officials except those who violate a "statutory or constitutional right that was clearly established at the time of the challenged conduct." Carroll v. Carman, 135 S. Ct. 348, 350 (2014). Determining whether qualified immunity is appropriate is a two-step inquiry. Pearson v. Callahan, 555 U.S. 223, 232 (2009). First, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right. Id. Second, the court must consider whether the right at issue was "clearly established" at the time of the alleged misconduct. Id.

While courts have the discretion to decide which of the steps to address first, based on the facts and circumstances of the case at hand, the two-step procedure is "often appropriate" and "beneficial" because it "promotes the development of constitutional precedent." Id. at 236. Indeed, "our regular

10

policy of avoidance" often "threatens to leave standards of official conduct permanently in limbo." Camreta v. Greene, 131 S. ct. 2020, 2024 (2011). To prevent that problem, the Supreme Court permits "lower courts to determine whether a right exists before examining whether it was clearly established." Id. Nevertheless, the Supreme Court instructs courts to "think hard, and then think hard again, before turning small cases into large ones." Id. at 2023.

After thinking hard about it twice, we determine that the two-step procedure is appropriate in this case in order to clearly establish the standard that probation officers must meet in order to arrest a probationer who allegedly violated the conditions of his probation.

A.

Jones contends that Appellees violated his Fourth Amendment rights by seeking his arrest for alleged probation violations. We first determine what level of suspicion Appellees must have had in order to arrest Jones for allegedly violating the terms of his probation. Then we determine whether Appellees had that level of suspicion here.

1.

Jones contends that Appellees violated his Fourth Amendment rights by seeking his arrest for alleged probation violations without reasonable suspicion or probable cause. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and "this usually requires the police to have probable cause or a warrant before making an arrest." Herring v. United States, 555 U.S. 135, 136 (2009). Probationers such as Jones, however, "do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." Griffin v. Wisconsin, 483 U.S. 868, 874 (1987) (citations and internal quotation marks omitted, alteration in original). The Supreme Court "has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." Samson v. California, 547 U.S. 843, 853 (2006).

Ultimately, "[t]he touchstone of the Fourth Amendment is reasonableness" and the reasonableness of a search or seizure is determined "by assessing, on the one hand, the degree to which

12

it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." United States v. Knights, 534 U.S. 112, 118–19 (2001) (citation and internal quotation marks omitted). A person's status as a probationer informs both sides of this reasonableness balance: the intrusion upon an individual's privacy and necessity to promote legitimate governmental interests. See id. at 119.

Neither the Supreme Court nor this Court has announced the level of suspicion required under the Fourth Amendment to arrest a probationer for a suspected probation violation. The Supreme Court faced an analogous issue in Knights—the level of suspicion required for searches of probationers—which provides guidance in the arrest context. In Knights, the Supreme Court determined that, where a probationer was subject to a probation condition that his person or property could be searched at any time without a warrant, reasonable suspicion that the probationer is engaged in criminal activity is enough to make a search reasonable. 534 U.S. at 121.

After Knights, it remains an open question whether a suspicionless search of a probationer can be constitutional. United States v. Midgette, 478 F.3d 616, 625 (4th Cir. 2007); Knights, 534 U.S. at 120 n.6. Additionally, the Supreme Court has upheld suspicionless searches of parolees pursuant to a

13

state statute allowing for such searches. Samson, 547 U.S. at 850 (noting that parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment). However, the privacy interests and governmental interests implicated in arrests and searches are sufficiently different to foreclose the possibility of a constitutional suspicionless arrest of a probationer. Cf. Segura v. United States, 468 U.S. 796, 806 (1984) ("Different interests are implicated by a seizure than by a search." (collecting cases)). Suspicionless arrests implicate obvious privacy concerns while doing little to advance the government's "two primary goals of probation—rehabilitation and protecting society from future criminal violations." Knights, 534 U.S. at 119.

On the other hand, these goals are advanced when probation officers seek the arrest of a probationer they reasonably believe has violated the terms of his probation. The government has strong interests both in ensuring that probationers adhere to the conditions of their probation and in effectively redressing probation violations if they do not. These interests are strengthened by the fact that probation is often imposed in lieu of incarceration and that conditions of probation are often intended to prevent future criminal conduct. While the privacy concerns implicated by an arrest are certainly substantial,

14

balancing the governmental and private interests supports a degree of suspicion lower than probable cause for arresting a probationer for an alleged probation violation. Cf. Knights, 534 U.S. at 121 ("Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."). Therefore, we hold that probation officers must have reasonable suspicion before seeking the arrest of a probationer for allegedly violating conditions of his probation.

"The concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation and quotations omitted). In Knights, the Supreme Court held that reasonable suspicion in the search context exists where there is "a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." Knights, 534 U.S. at 121. Relying on Knights, we hold that reasonable suspicion in the arrest context is present when there is a sufficiently high probability that a probationer has violated the terms of his probation to make the intrusion on the individual's privacy interest reasonable.

15

2.

With a reasonable suspicion standard in hand, we next must determine whether Appellees had reasonable suspicion in this case that Jones had violated the terms of his probation. Appellees contend that they had reasonable suspicion that Jones violated the terms of his probation in two ways: by failing to pay his costs and fines and by absconding. While this is admittedly a close case, we conclude that considering the totality of the circumstances, there was not reasonable suspicion of either violation. See Knights, 534 U.S. at 118 (holding that reasonableness under the Fourth Amendment is determined by "examining the totality of the circumstances" (citation and quotations omitted)).

Whether Appellees had reasonable suspicion that he violated a probation condition by failing to pay costs and fines turns largely on application of the North Carolina probation statute. North Carolina law provides that as a regular condition of probation, a defendant must pay court costs and any fine ordered by the court. N.C. Gen. Stat. § 15A-1343(b)(9). "[T]he court may delegate to a probation officer the responsibility to determine the payment schedule." Id. § 15A-1343(g). A probationer "must be given a written statement explicitly setting forth the conditions on which he is being released." Id. § 15A-1343(c). Additionally, a probationer "must be given a

16

written statement setting forth" any modification to the conditions of his probation that is subsequently made.  Id.

North Carolina courts have read the written statement requirement of § 15A-1343(c) quite strictly.  In State v. Suggs, the sentencing court modified the terms of the defendant's probation to add a special condition that the defendant surrender his driver's license and not operate a car for 6 months.  373 S.E.2d 687, 687 (N.C. Ct. App. 1988).  However, a written statement setting forth this condition was not given to the defendant and after being charged with violating that condition, the defendant moved to dismiss the charge because he had not received a written copy of the modification.  Id.  The North Carolina Court of Appeals found that the provision of § 15A-1343(c) requiring written notice of a modification was "obviously . . . mandatory" and that the court had "no authority to rule otherwise."  Id. at 688.  The court rejected the state's argument that oral notice was a satisfactory substitute for a written statement, holding that such a reading would "render the statute nugatory."  Id.  Therefore, the court concluded that the purported modification "was of no effect."  Id.  The North Carolina Court of Appeals confirmed this reading of § 15A-1343 in State v. Seek, finding that an oral modification was

17

similarly unenforceable.[3]   566 S.E.2d 750, 751 (N.C. Ct. App. 2002).

In a case with similar facts to those here, a probationer was ordered to perform community service and pay court costs and fines as conditions of his probation.   State v. Boone, 741 S.E.2d 371, 371 (N.C. Ct. App. 2013).   Although the schedule for the defendant's payments and community service was to be established by the probation officer, there was no evidence that a schedule had been established.   Id. at 371–73.   The probation officer filed a violation report alleging that the defendant had violated his probation by failing to complete his community service and failing to pay the entire amount of costs owed.   Id. at 371–72.   At a revocation hearing, the sentencing court ordered the defendant's probation revoked.   Id. at 372.   The North Carolina Court of Appeals reversed, basing its ruling on the lack of a schedule for payment or community service and the

---

[3] Suggs and Seek both considered modifications of probation conditions rather than original conditions, and there is some disagreement between the parties about whether the DCC-2 form—had it been completed and given to Jones—would be an original condition of probation or a modification.   Jones did receive a Criminal Bill of Costs, which listed the due date for the costs and fines as July 7, 2012—the day his probation was to end. However, we need not decide whether this Bill of Costs was a condition of probation that the DCC-2 form would have modified or whether the DCC-2 form itself would have been an original condition of probation.   Section 15A-1343(c) requires that a probationer "must be given a written statement" of either an original condition or a modification.

18

fact that, at the time of the violation report, six months remained on the defendant's probation. Id. at 372. Although not explicitly relying on § 15A-1343(c), the Boone court held that in the absence of a payment schedule, there was insufficient evidence to support a finding that the defendant had violated the terms of his probation. Id.

Based on the plain language of § 15A-1343(c)—as well as the North Carolina Court of Appeals' holdings in Suggs, Seek, and Boone—it is clear that a payment plan is a condition of probation that must be provided to a probationer in writing and, if a payment plan is not provided to the probationer in writing, it is unenforceable.[4] It is undisputed that Jones was never presented with any writing indicating that his costs and fines were due before the end of his probation. Therefore, Appellees could not have had reasonable suspicion that Jones violated a condition of probation by failing to pay his costs and fines

---

[4] The district court invoked Pullman abstention to avoid determining whether § 15A-1343 gives probation offers discretion whether to put a payment plan in writing. However, we are convinced that § 15A-1343(c) requires all conditions of probation to be in writing in order to be enforceable. While § 15A-1343(g) allows a court to delegate to a probation officer the responsibility to determine a payment schedule, it does not give the probation officer the discretion to not set a payment plan or to not provide that payment plan in writing to the defendant.

19

because there was no enforceable condition requiring him to pay the costs and fines before the termination of his probation.[5]

In seeking Jones's arrest, Appellees also claimed that Jones had absconded from supervision. This was based on several attempts by Chandrasuwan to reach Jones by phone and mail. As an initial matter, we note that this absconding charge was based entirely on Appellees' attempts to contact Jones regarding a probation violation they unreasonably believed he had committed. In other words, if Appellees had realized that there was no enforceable payment condition, they never would have attempted to contact him and the absconding charge would not have come about.

Nevertheless, Appellees did not have reasonable suspicion that Jones had absconded. Their attempts to reach Jones were completely outside of the Compact. They had no communications

---

[5] Appellees base their reasonable suspicion on a communication from the Georgia Compact office stating that a Georgia probation officer told Jones that he needed to pay the costs and fines and that Jones said would pay "by the end of the month." J.A. 46. As an initial matter, Waller issued a violation report before he heard back from Georgia and there is no evidence that Appellees saw the communication indicating that Jones would pay his costs and fines by the end of February. Moreover, even if Appellees saw this communication from Georgia, there was still no enforceable written condition requiring Jones to pay the costs and fines by the end of the month. See Seek, 152 N.C. App. at 239 ("[O]ral notice is not a satisfactory substitute for the written statement that the statute requires." (citation, quotations, and alteration omitted)).

with Georgia probation officials, who Appellees acknowledge were supervising Jones's probation.[6] Both DCC and Compact Rules require that communications regarding violations be transmitted between the Compact offices of the sending and receiving states. See J.A. 100 (Compact Rule 2.101(d) providing that "[v]iolation reports or other notices regarding offenders under this compact shall be transmitted only through direct communication of the compact offices of the sending and receiving states."); Addendum to Appellant's Br. 39-40 (Chapter D Section .0300 of DCC policy providing that if the North Carolina probation office wants the offender to return to North Carolina for a hearing, the violation report should be submitted through ICOTS). Quite simply, there was not a sufficiently high probability that Jones absconded because no effort was made to contact the office responsible for supervising Jones's probation.

Therefore, Appellees violated Jones's Fourth Amendment rights by seeking his arrest for alleged probation violations without reasonable suspicion.

---

[6] It seems especially odd that Appellees—who assert that they relied on communications from the Georgia compact office indicating that Jones would pay his costs and fines by the end of the month—would not contact the Georgia Compact office to determine Jones's whereabouts, especially when they knew Georgia probation officials had been in contact with Jones only a month earlier.

21

Even after finding that Appellees violated Jones's constitutional rights by seeking his arrest without reasonable suspicion, we still must determine whether that right was clearly established. We hold that it was not.

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" Carroll, 135 S. Ct. at 350 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011).

As discussed above, neither the Supreme Court nor this Court had announced the level of suspicion required under the Fourth Amendment to arrest a probationer for a suspected probation violation. In other words, precedent had not placed the level of suspicion required to arrest a probationer "beyond debate." Id. The district court acknowledged that "this area of the Fourth Amendment is particularly murky." J.A. 133. This "murkiness" is also demonstrated by the fact that Jones originally argued that Appellees violated his rights by arresting him without probable cause, before later settling on a reasonable suspicion standard. As discussed above, precedent

22

had not definitively ruled out suspicionless arrests of probationers.

Therefore, we conclude that the standard required by the Fourth Amendment to arrest a probationer was not clearly established at the time Appellees sought Jones's arrest for allegedly violating the terms of his probation.

IV.

Although we find that Appellees violated Jones's Fourth Amendment rights, we affirm the district court's conclusion that they are entitled to qualified immunity because the right at issue was not clearly established at the time Appellees sought Jones's arrest.

AFFIRMED