[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11452

_____

DESHAWN GERVIN,

Plaintiff-Appellee,

*versus*

PAMELA FLORENCE,
TANDRIA MILTON,
In their individual capacities,

Defendants-Appellants,

HOKE HAMPTON,
In her individual capacity,

Defendant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 1:21-cv-00067-LAG

_____

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

DeShawn Gervin has not been a model citizen. But he did do at least one thing right. As Gervin's sole condition of probation, a Georgia court kicked him out of its jurisdiction and banned him from returning. And Gervin followed that instruction. He moved to North Carolina.

But he didn't stay out of trouble there, either. North Carolina imprisoned Gervin for breaking and entering, larceny, and robbery and kidnapping.

Soon after, a probation officer with the Georgia Department of Community Supervision learned of Gervin's North Carolina transgressions. And she sought a warrant for his arrest in Georgia. In support, she swore that Gervin had "failed to report" and "absconded from probation supervision" in violation of his probation conditions. Another probation officer under her supervision then petitioned to revoke Gervin's probation based on his failure to report.

After the probation officer obtained the warrant, police officers in North Carolina arrested Gervin on the Georgia warrant. Then they extradited Gervin to Georgia. And Gervin spent 104 days in jail waiting for the court to resolve his probation-revocation charges.

But as we've recounted, the Georgia court's only probation condition for Gervin required him never to reenter its judicial circuit. And that's the one thing he had not done. So however else Gervin had broken the law, he had not violated his Georgia probation.

For that reason, the Georgia court concluded that the State failed to show that Gervin had violated his probation. So it ordered Gervin's release.

After his release, Gervin sued the two probation officers under 42 U.S.C. § 1983. He alleged violations of his Fourth, Eighth, and Fourteenth Amendment rights. The probation officers moved for summary judgment, and the district court denied their motion.

We now affirm the district court's ruling. When we view the evidence in the light most favorable to Gervin as the non-moving party, the probation officers recklessly swore that Gervin had violated his Georgia probation, even though it was clear that he had not. That violated Gervin's Fourth and Fourteenth Amendment right to be free from unreasonable seizures because the officers' misconduct caused his arrest and prolonged confinement. And because every reasonable state official would have understood that the Fourth and Fourteenth Amendments prohibit recklessly

4                      Opinion of the Court                    23-11452

making false statements and material omissions to obtain an arrest warrant and prosecute a probation violation, the probation officers are not entitled to qualified immunity.

## I.    BACKGROUND

### A.  Factual Background

In January 2012, Plaintiff-Appellee DeShawn Gervin pled guilty to attempted burglary in violation of Georgia law. The Georgia state court sentenced him to one year of incarceration and nine years of probation.

As especially relevant here, the court imposed *only one* condition of probation: Gervin could not return to the South Georgia Judicial Circuit, which includes Mitchell, Baker, Calhoun, Decatur, and Grady Counties. The court did not add any "general" conditions of probation. So for instance, it did not require Gervin to report to a probation officer or to inform a probation officer of a change in residence. Indeed, the court did not check the boxes next to those requirements on Gervin's sentencing form.[1]

Within a month of Gervin's guilty plea, the jail released Gervin. A sheriff's deputy then escorted him (in restraints) to a bus station. At the sheriff's direction, the deputy watched Gervin board

---

[1] *See Jones v. State*, 282 Ga. 784, 787 (2007) (concluding no condition of probation imposed where "[a]lthough the pre-printed sentencing form provided a list of general and special conditions of probation . . . , the box next to the [relevant] condition was not checked").

a bus bound for Missouri and waited until it pulled away with Gervin onboard. After that, Gervin moved to North Carolina.

Defendant-Appellant Pamela Florence, a probation officer with the Georgia Department of Community Supervision, was assigned to supervise Gervin during his probation. In April 2012, she learned that Gervin had been released from a Georgia jail and was incarcerated in North Carolina for breaking and entering and larceny. Florence applied for a warrant for Gervin's arrest. In support, she said that Gervin had "failed to report" and "absconded from probation supervision." She also said "his whereabouts [were] unknown." But those statements, as we've noted, were false.

Later, when describing her actions before seeking the warrant, Florence testified that she was "sure [she] looked at [Gervin's] sentence." In fact, department policy required her to do so before seeking an arrest warrant. Florence also acknowledged knowing that the sentencing judge made a practice of reading probation conditions from the bench. Yet Florence did not obtain or attempt to obtain the sentencing-hearing transcript, though she had requested sentencing transcripts in the past for other people.

A Mitchell County Superior Court judge granted the warrant application.

Then on April 26, 2019, after Gervin served a jail sentence for robbery and kidnapping, North Carolina police arrested him during a traffic stop and extradited him to Georgia. Defendant-Appellant Tandria Milton, a probation officer under Florence's supervision, petitioned to revoke Gervin's probation based on his

failure to report. Milton also testified that she reviewed Gervin's sentence before seeking to revoke Gervin's probation.

The Superior Court held Gervin's revocation hearing on August 7, 2019. In the meantime, Gervin spent 104 days in a Georgia jail waiting for that hearing.

At the hearing, Milton testified. She noted that Gervin had neither reported to his probation officer since January 2012 nor informed his probation officer of his change in residence. On cross-examination, Gervin's counsel asked Milton to examine Gervin's sentence disposition. When Milton did so, she conceded that Gervin's probation included only one condition: to not return to the South Georgia Judicial Circuit during its term.

The state court did not revoke Gervin's probation. It concluded that the State had failed to meet its burden to show that Gervin violated his probation terms. So the jail released Gervin that day. His probation term ended in January 2021.

## B. Procedural History

Gervin sued Florence and Milton[2] under 42 U.S.C. § 1983. He alleged violations of his Fourth, Eighth, and Fourteenth Amendment substantive-due-process rights. As relief for his

---

[2] Gervin's complaint also named Hoke Hampton, who tolled Gervin's probation pending the revocation hearing. Defendants argued that Hampton caused no harm because Gervin's probation was reinstated and completed on time. Gervin agreed, so the district court granted summary judgment for Hampton. Hampton is not a party to this appeal.

alleged "loss of liberty, humiliation, emotional distress, and physical pain and suffering," Gervin sought nominal, compensatory, special, and punitive damages.

Defendants moved for summary judgment.

The district court granted that motion in part (on the Eighth and Fourteenth Amendment substantive-due-process claims) and denied it in part (on the Fourth Amendment claim). In doing so, it characterized Gervin's Fourth Amendment claim as a malicious-prosecution claim. The district court acknowledged that we have said a revocation of probation is not a "prosecution" in other contexts. Still, on the facts here, the court reasoned, "the fundamental protections afforded by the Fourth Amendment against unlawful search and seizure appear to be implicated." And the court concluded a reasonable jury could find that Florence and Milton "intentionally or recklessly made or submitted material misstatements" "to advance the legal process."

## II.    STANDARDS OF REVIEW

We review a grant of summary judgment de novo, construing all evidence in the light most favorable to the non-moving party. *Rodriguez v. City of Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017). For summary-judgment motions based on qualified immunity, "we are required to resolve all issues of material fact in favor of the plaintiff." *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477

U.S. 317, 322–23 (1986). An issue is genuine if a reasonable trier of fact could return judgment for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law" and is not "irrelevant or unnecessary." *Id.*

## III.    DISCUSSION

On appeal, Defendants argue the district court erred in denying summary judgment for two reasons. First, they assert that the district court should have granted summary judgment on the merits because a proceeding to revoke probation is not a "criminal prosecution" within the scope of the tort of malicious prosecution. And second, even if Gervin prevails on the merits, they contend that they are entitled to qualified immunity because any constitutional violation they may have committed was not clearly established at the time they engaged in their acts. We reject both arguments and address each in turn.[3]

### A. *Gervin adduced enough evidence to create a triable issue of fact on a Fourth Amendment malicious-prosecution claim.*

We divide our discussion of this point into two parts. First, we outline the relevant constitutional and statutory principles that

---

[3] In this interlocutory appeal from a partial denial of Defendants' motion for summary judgment, we resolve only the issues that Defendants raised in their motion in the district court and repeat on appeal. We do not address other possible arguments or defenses the parties could have presented. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation.").

govern Gervin's claim, and we apply them to the facts of his case. Based on our review, we conclude that Gervin has submitted enough evidence to proceed to trial on his Fourth Amendment malicious-prosecution claim. Then, we address Defendants' primary argument on appeal: that the tort of malicious prosecution provides redress for abuse of criminal prosecutions only, not for abuses of probation-revocation proceedings. We reject that argument as inconsistent with the Fourth Amendment and the common law.

### 1. Gervin can establish a Fourth Amendment malicious-prosecution claim.

The Fourth Amendment "secure[s]" the "people . . . against unreasonable searches and seizures," and it guarantees that "no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. Originally, our Constitution did not enable the federal courts to secure that right against state deprivation. *Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833). But after Americans ratified the Fourteenth Amendment, which incorporates our Bill of Rights against the states and their officials, Congress enacted what is currently codified at Title 42, United States Code, Section 1983. That Section provides, "[e]very person who, under color of" state law, "subjects . . . any . . . person . . . to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured . . . for redress." 42 U.S.C. § 1983.

Section 1983 is an "independent cause of action designed" to "allow for private enforcement" of federal rights "in courts." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). So plaintiffs may use it to sue

state officials who unreasonably seize them in violation of the Fourth Amendment. Although the text of Section 1983 makes that much clear, neither it nor the Fourth Amendment itself specifically prescribes the full scope of an unreasonable-seizure claim. *See Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017) ("After pinpointing that right, courts still must determine the elements of, and rules associated with, an action seeking damages for its violation."); *cf. Crawford v. Washington*, 541 U.S. 36, 42 (2004) ("The Constitution's text does not alone resolve this case.").

To fill that textual gap, we turn to "the common law of torts." *Carey v. Piphus*, 435 U.S. 247, 257 (1978). "[O]ver the centuries," that body of law "has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights." *Id.*

Section 1983, like most statutes built on a common-law background, brings the "old soil with it." *Hall v. Hall*, 584 U.S. 59, 73 (2018) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). The Supreme Court recently reminded us of this yet again in *Thompson v. Clark*. 596 U.S. 36 (2022). There, it explained that "[t]o determine the elements of a constitutional claim under § 1983," we "first look to the elements of the most analogous tort as of 1871 when § 1983 was enacted, so long as doing so is consistent with 'the values and purposes of the constitutional right at issue.'" *Id.* at 43 (quoting *Manuel*, 580 U.S. at 370).

Here, the most analogous tort for Gervin's claims is "malicious prosecution," which we sometimes call "a claim for unreasonable seizure pursuant to legal process." *Id.* at 42; *see Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020) (explaining malicious prosecution is a "shorthand way of describing" certain Fourth Amendment claims, such as seizure pursuant to legal process).

The Supreme Court has explained that "[i]n American courts as of 1871, the malicious prosecution tort generally allowed recovery against an individual who had initiated or caused the initiation of criminal proceedings despite having 'no good reason to believe' that criminal charges were 'justified by the facts and the law.'" *Thompson*, 596 U.S. at 43 (quoting THOMAS M. COOLEY, A TREATISE ON THE LAW OF TORTS OR THE WRONGS WHICH ARISE INDEPENDENT OF CONTRACT 180 (Chi., Callaghan & Co. 1879)). During that period, a plaintiff could state a claim for malicious prosecution by showing three elements: "(i) the suit or proceeding was 'instituted without any probable cause'; (ii) the 'motive in instituting' the suit 'was malicious,' which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution 'terminated in the acquittal or discharge of the accused.'" *Id.* at 44 (quoting COOLEY, *supra*, at 181).

Our precedent incorporates these three elements into a modern claim for violation of the Fourth Amendment's guarantee

of security against unreasonable seizures.[4]  But because Section 1983 incorporates the element of common-law torts only "so long as doing so is consistent with 'the values and purposes of the constitutional right at issue,'" *id.* at 43 (quoting *Manuel*, 580 U.S. at 370)—here, a Fourth Amendment violation—we combine the Fourth Amendment's constitutional elements with those of a traditional malicious-prosecution tort, *see Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023) (explaining that because "the claim is a mashup of sorts," plaintiffs must meet both the Fourth Amendment's requirements and those of the common-law tort of malicious prosecution).  So a plaintiff must also prove that he was seized "pursuant to the legal process," *Heck v. Humphrey*, 512 U.S. 477, 484 (1994), "that the legal process justifying his seizure was constitutionally infirm," and "that his seizure would not otherwise be justified without legal process," *Williams*, 965 F.3d at 1165.

In practice, though, a malicious-prosecution claim's common-law elements meld with the Fourth Amendment's textual

---

[4] We've at times said that a plaintiff must also show that the malicious prosecution "caused damage." *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019) (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003)).  But we've also held that a plaintiff need not prove compensatory damages to state a claim for Fourth Amendment malicious prosecution because "a plaintiff may recover *nominal* damages even though he suffers no compensable injury." *Kelly v. Curtis*, 21 F.3d 1544, 1557 (11th Cir. 1994); *accord Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020).  So a plaintiff may still succeed in his Fourth Amendment malicious-prosecution suit without litigating the damages element as long as his complaint includes a prayer for nominal damages. Gervin's does.

components because a "significant overlap" exists between them. *Luke v. Gulley* ("*Luke I*"), 975 F.3d 1140, 1143 (11th Cir. 2020). For instance, "[i]f a plaintiff establishes that a defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process, he has also established that the defendant instituted criminal process against him with malice and without probable cause." *Id.* at 1444. So the questions whether a defendant instituted or continued a legal proceeding with malice and without probable cause "effectively merge[]" with our case law on unconstitutional seizures. *Butler*, 85 F.4th at 1112.

When we account for the overlap in elements between the Fourth Amendment and the common-law tort of malicious prosecution, to prove a Fourth Amendment malicious-prosecution claim in our Circuit, a plaintiff must establish four elements: (1) the plaintiff was seized under legal process; (2) the legal process justifying the plaintiff's seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process. *See id.* at 1111–12 (outlining the relevant elements and how they merge); *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (identifying a simplified two-step test that breaks down into these elements).[5]

---

[5] In *Butler*, we initially listed six elements to a Fourth Amendment malicious-prosecution claim—adding qualified immunity's requirements as a seventh—and explained, like we do above, how some of those elements merge together. 85 F.4th at 1111–12. Today's recitation of the claim's elements differs in three ways. First, we merge the overlapping elements. Second, we leave the discussion of qualified immunity for later. And third, we make explicit *Butler*'s

14                    Opinion of the Court                    23-11452

Applying these elements to Defendants' conduct, construed in the light most favorable to Gervin, is easy enough.

*First*, Florence seized Gervin under legal process "by seeking and obtaining the warrants" that led to Gervin's arrest. *Butler*, 85 F.4th at 1112. And Milton took "affirmative act[s] to continue [Gervin's] seizure," *Howard*, 25 F.4th at 912, by filing the probation-revocation petition and by offering "later testimony" at the probation-revocation hearing, *id.* at 904. Both acts "continue[d] [Gervin's] detention." *Id.* So Florence and Milton effectuated the legal process that resulted in Gervin's 104-day stint in jail.

*Second*, the legal process justifying Gervin's seizure was constitutionally infirm. A plaintiff may prove that element by, among other means, showing (a) that the defendant "intentionally or recklessly made misstatements or omissions necessary to" support the legal process that resulted in or continued the plaintiff's seizure, *Williams*, 965 F.3d at 1165; *see Paez v. Mulvey*, 915 F.3d 1276, 1283, 1287, 1291 (11th Cir. 2019) (warrant application); *Howard*, 25 F.4th at 907 (testimony), and (b) that those misstatements or omissions were material, meaning "probable cause would be negated if the offending statement[s] w[ere] removed or the omitted information included," *Paez*, 915 F.3d at 1287.

---

implicit understanding that a "seizure" within the meaning of the Fourth Amendment has occurred. *See id.* at 1112 (explaining the prosecution caused Butler "damage by landing her in jail for four days").

Defendants don't dispute that Gervin established this element. Nor could they. Florence's statements in the warrant affidavit were false. And so were Milton's statements in the revocation petition. Both claimed that Gervin's conditions of probation required him to report to his probation officer and to receive permission from his probation officer to move residences. But in fact, Gervin's terms of probation imposed no such conditions. And Milton's testimony at the revocation hearing omitted that material fact: she testified that Gervin failed to report to his probation officer and that he moved without his probation officer's permission. But she did not explain that Gervin's terms of probation did not require him to do so.

Plus, Defendants made those misstatements and omissions recklessly. Florence and Milton both testified that they reviewed Gervin's sentence before applying for and testifying in support of the arrest warrant. So both should have seen that the boxes next to conditions #4 and #6 were unchecked and that Gervin was not required to report to a probation officer. Also, Florence testified that she knew the sentencing judge had a practice of reading probation conditions from the bench and that she had previously obtained sentencing transcripts to check probation conditions for other probationers. Yet she did not obtain or attempt to obtain the sentencing hearing transcript in Gervin's case.

In other words, Florence and Milton "possessed information giving rise to an exculpatory inference" but did nothing to examine the "easily discoverable facts that would confirm or contradict that

inference." *Washington v. Rivera*, 939 F.3d 1239, 1248 (11th Cir. 2019) (footnote and internal quotation marks omitted); *see Sevigny v. Dicksey*, 846 F.2d 953, 957–58 (4th Cir. 1988) (finding a Fourth Amendment violation where an officer "did not avail himself of readily available information" or undertake "rudimentary inquiries" that would have revealed the arrest to be "factually unsupportable"). So Defendants' misstatements and omissions were reckless.

And without those misstatements (and adding in the omissions), nothing in the warrant affidavit, the probation-revocation petition, or Milton's testimony establishes probable cause. *See Williams*, 965 F.3d at 1165. The sole condition of Gervin's probation was banishment. But no evidence in the relevant records shows he failed to comply with that condition. *See id.* at 1162 (explaining insufficient affidavits or testimony "cannot be rehabilitated" with "information . . . not disclosed to the issuing magistrate"); *accord Luke v. Gulley* ("*Luke II*"), 50 F.4th 90, 96 (11th Cir. 2022). To the contrary, Gervin was living in North Carolina, well outside the South Georgia Judicial Circuit, at the time of the arrest and probation revocation. So no probable cause existed for his arrest and prolonged seizure in Georgia. And as a result, Gervin has showed that that his seizure was constitutionally infirm.

*Third*, the probation-revocation proceeding terminated in Gervin's favor. To satisfy the favorable-termination requirement, a plaintiff must show only that the "proceedings against" him "formally end[ed] in a manner not inconsistent with his innocence on at least one charge that authorized his confinement." *Laskar*, 972

F.3d at 1295; *see Thompson*, 596 U.S. at 49 (holding that a plaintiff obtains a favorable resolution of a criminal prosecution when it ends "without a conviction"). Here, Gervin established that the state court released him without revoking his probation. So the court dismissed the probation-revocation proceedings against Gervin "in a manner not inconsistent with his innocence." *Laskar*, 972 F.3d at 1295.

And *fourth*, Gervin's seizure was otherwise unjustified. Because Gervin "was detained for longer than 48 hours, [his] seizure would have been 'presumptively unconstitutional'—and thus not otherwise justified—if effectuated without legal process." *Butler*, 85 F.4th at 1112 (quoting *Williams*, 965 F.3d at 1164).

In short, when we construe the facts in Gervin's favor, as we must do on review of an order denying summary judgment for a qualified-immunity defense, we conclude that Gervin submitted enough evidence to support his Fourth Amendment malicious-prosecution claim. And the district court did not err in denying Defendants' motion for summary judgment on the merits of that claim.

2. Neither the Fourth Amendment nor the common law supports Defendants' argument that unjustified detentions under probation-revocation proceedings fall outside the scope of a Fourth Amendment malicious-prosecution claim.

Florence and Milton seek to avoid the conclusion that Gervin has produced enough evidence to establish a Fourth

Amendment malicious-prosecution claim.  They argue that a probation revocation is not a "criminal prosecution" within the scope of the malicious-prosecution tort.

Our past opinions perhaps provide some nominal support for this position.  *See Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003) (listing the first element of the common-law tort of malicious prosecution as "a criminal prosecution instituted or continued by the present defendant" (citing *Uboh v. Reno*, 141 F.3d 1000, 1004 (11th Cir. 1998))); *Paez*, 915 F.3d at 1285 (same); *Williams*, 965 F.3d at 1157 (same); *Butler*, 85 F.4th at 1111 (same).

But for two reasons we explain below, we reject Defendants' argument.  First, the Fourth Amendment imposes no such limitation on its guarantee of security against unreasonable seizures.  And second, at common law, the tort of malicious prosecution would have encompassed the initiation or continuation of a probation-revocation proceeding, even though it is not a criminal proceeding.

> i.   *The Fourth Amendment does not limit unreasonable-seizure claims to legal process initiated in criminal prosecutions.*

We start, first, with the text.  But for context, before we review the Fourth Amendment, we consider how the Founders drafted other guarantees in the Bill of Rights.

Take the Fifth Amendment's protection against compelled testimony.  By its text, it covers only "criminal case[s]."  U.S. CONST.

amend. V.[6] And the Sixth Amendment liberties—like the right to a speedy and public trial, to the assistance of counsel, and to confront witnesses—extend to only "criminal prosecutions." *Id.* amend. VI.[7]

But the Fourth Amendment is different. Unlike the Fifth and Sixth Amendments, it includes no explicit temporal limitations. Rather, the Fourth Amendment's protections apply whenever a government official seizes someone unreasonably. And they remain in place through that person's trial on the cause invoked to justify their seizure. *See Manuel*, 580 U.S. at 369 n.8 (rejecting that a claim for unreasonable seizure pursuant to legal process ends with a grand-jury indictment and explaining that it instead ends with the conclusion of the trial). Indeed, the Supreme Court has explained, "[i]f the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment." *Id.* at 367. So here, where the cause Defendants invoked to justify Gervin's seizure is a probation revocation, the Fourth Amendment

---

[6] "[N]or shall [any person] be compelled in any *criminal case* to be a witness against himself . . . ." U.S. CONST. amend. V (emphasis added).

[7] "In all *criminal prosecutions*, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI (emphasis added).

secures Gervin against any baseless, preliminary detention that resulted from such legal process.

It makes no difference that the probation-revocation proceedings came after the criminal trial that led to Gervin's conviction. The Fourth Amendment applies "[w]hatever" the "precise form" of the "proceeding" used to justify a seizure. *Id.* at 369 n.8. As a result, not only does the Fourth Amendment govern pretrial detentions, but it also protects probationers held in prehearing detention.[8] We've explained, after all, that "[t]here is no question that the Fourth Amendment's protection against unreasonable searches and seizures applies to probationers." *Owens v. Kelley*, 681 F.2d 1362, 1367 (11th Cir. 1982); *see Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (explaining     the     Fourth     Amendment's     protection     against

---

[8] In contrast, we have held that several Fifth and Sixth Amendment guarantees do not extend to probation-revocation proceedings. *See, e.g.*, *United States v. Reese*, 775 F.3d 1327, 1329 (11th Cir. 2015) (per curiam) ("[T]he Sixth Amendment [right to confrontation] does not apply in hearings for the revocation of supervised release, probation, or parole."); *United States v. Cunningham*, 607 F.3d 1264, 1267–68 (11th Cir. 2010) (per curiam) (holding the use of the preponderance-of-the-evidence standard and the lack of a jury-trial right in revocation proceedings did not violate the Fifth and Sixth Amendments); *United States v. Woods*, 127 F.3d 990, 992 (11th Cir. 1997) (per curiam) ("[R]evocation of probation for commission of a subsequent criminal offense does not constitute punishment for that criminal offense for purposes of double jeopardy . . . ."); *United States v. Taylor*, 931 F.2d 842, 848 (11th Cir. 1991) (per curiam) ("[R]evocation hearings are not criminal prosecutions under the sixth amendment and thus, the defendant is not constitutionally guaranteed a speedy hearing."); *Morgan v. Wainwright*, 676 F.2d 476, 481 (11th Cir. 1982) (holding no right to a jury at probation-revocation hearing).

unreasonable searches extends to a "probationer's home, like anyone else's").[9] And a constitutionally unreasonable seizure—even a seizure of a probationer—forms the core of a Fourth Amendment malicious-prosecution claim.

So both text and precedent confirm a Fourth Amendment malicious-prosecution claim does not require proof of a criminal prosecution. Or, at least, it does not require the narrow definition of "criminal prosecution" that Defendants hope to give that term. "Common-law principles are meant to guide rather than to control the definition of § 1983 claims . . . ." *Manuel*, 580 U.S. at 370. "We cannot elevate the common law over the Constitution." *Williams*, 965 F.3d at 1157. So we use the phrase "'malicious prosecution' as only 'a shorthand way of describing' certain claims of unlawful

---

[9] Defendants argue that the Supreme Court has held that the Fourth Amendment does not protect probationers as fully as it does law-abiding individuals. That is true. *See, e.g.*, *United States v. Knights*, 534 U.S. 112, 121–22 (2001) (holding officers need only reasonable suspicion to conduct a warrantless search of a probationer's home because probationers have a diminished expectation of privacy and are more likely than are law-abiding citizens to commit a crime in the future). *But see Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (requiring a "hearing at the time of [a parolee's] arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole"). But Defendants do not explain why that eliminates Gervin's Fourth Amendment claim. Even if we assume that the fact of Gervin's probation would lower the state's burden-of-proof for obtaining an arrest warrant, Defendants still violated Gervin's allegedly tempered Fourth Amendment rights. They lacked even a reasonable suspicion that Gervin violated the conditions of his probation. *See Jones v. Chandrasuwan*, 820 F.3d 685, 696 (4th Cir. 2016) ("Appellees violated [the plaintiff's] Fourth Amendment rights by seeking his arrest for alleged probation violations without reasonable suspicion.").

seizure under the Fourth Amendment." *Id.* (quoting *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384, 389–90 (2007)). By focusing on the "prosecution" in "malicious prosecution," Defendants take the label too literally. But when it comes to the Fourth Amendment, a "[r]ose is a rose is a rose is a rose," even if we're talking about an alleged Fourth Amendment violation that a probationer's malicious-prosecution claim pursues. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1331 & n.2 (11th Cir. 2014) (quoting GERTRUDE STEIN, GEOGRAPHY AND PLAYS 187 (The Four Seas Press 1922) (1913)).

We've made this point several times before. In *Whiting*, one of our "oldest decisions on the subject," *Laskar*, 972 F.3d at 1294,[10] we explained that the constitutional seizure, not the prosecution, is the touchstone of a Fourth Amendment malicious-prosecution claim. We focused on the fact that Whiting "based his claim—whatever he calls it—on some actual unlawful, forcible, restraint of his person." 85 F.3d at 584. And although we discussed Whiting's claim in the context of the "criminal proceedings" that injured him, *id.* at 583–84, 585 n.8, we ultimately homed in on the touchstone our precedent now adopts: "seizures . . . pursuant to legal process," *id.* at 585. *See id.* at 585–86 (explaining an arrest pursuant to a warrant constitutes a seizure "pursuant to legal process"); *Kelly v. Curtis*,

---

[10] For this reason, *Uboh*, *Wood*, and its progeny, which came after *Whiting*, do not bind us as prior-panel precedent. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir. 1993) (explaining we're bound by the "first panel to address an issue of law").

21 F.3d 1544, 1554–55 (11th Cir. 1994) (finding a "malicious prose-cution" based on an arrest, in fact, followed by an unlawful warrant application and physical restraint); *NAACP v. Hunt*, 891 F.2d 1555, 1563 (11th Cir. 1990) (borrowing Alabama common law to con-clude that, to prove a Section 1983 malicious-prosecution claim, the plaintiff must show the defendant initiated a "judicial proceeding").

And more recently, in *Laskar v. Hurd*, we confronted an ar-gument similar to Defendants' when we assessed the interplay be-tween the Fourth Amendment and a malicious-prosecution claim's favorable-termination requirement. There, the defendants argued that the common law required a plaintiff asserting a Fourth Amendment malicious-prosecution claim to show that the criminal proceeding against the plaintiff terminated with a finding of the plaintiff's innocence on the charges pressed. *Laskar*, 972 F.3d at 1285. We rejected that argument as an errant reading of the com-mon law and the Fourth Amendment. *See id*. at 1292.

We emphasized that the validity of the plaintiff's Fourth Amendment claim turned on "whether the seizure was justified, not whether the prosecution itself was justified." *Id*. So, we rea-soned, adopting the innocence-finding requirement would inap-propriately "redirect[] the focus" of our analysis away from the sei-zure's justification "to whether the entire prosecution was justi-fied." *Id*. Indeed, we went so far as to conclude that because "'the Fourth Amendment protects against "searches" and "seizures" (and not "prosecutions"),' the favorable-termination requirement functions as a rule of accrual, not as a criterion for determining

whether a constitutional violation occurred." *Id*. (quoting *Whiting*, 85 F.3d at 584).  As a result, the favorable-termination element played only a "limited role" in our analysis of the plaintiff's claims. *Id*. at 1293.  And in turn, we rejected the stringent innocence-finding approach to the favorable-termination element that the defendants advanced.  *Id*.

Today's reading of the Fourth Amendment is the next chapter of the same book.  Because the Fourth Amendment protects against "searches" and "seizures" (and not "prosecutions"), Gervin can state a Fourth Amendment malicious-prosecution claim even if the legal process by which he was seized was not part of a formal, criminal prosecution.  *See Howard*, 25 F.4th at 898 (focusing on "unreasonable seizures pursuant to legal process"); *id*. at 911 (equating "a criminal prosecution" and "a civil action that resulted in an arrest"); *cf. DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1309 (11th Cir. 2019) (describing elements of "wrongful civil proceedings claims" as "settled law" incorporated by Section 1983).

Focusing on the form of the legal process would, like the innocence-finding requirement at issue in *Laskar*, inappropriately "redirect[] the focus" of our analysis from the relevant Fourth Amendment question: whether a "seizure" occurred.  *Laskar*, 972 F.3d at 1292.  As the Supreme Court has put it, "[i]f the complaint is that *a form of legal process* resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment."  *Manuel*, 580 U.S. at 367 (emphasis added).

To be sure, the tort's common-law elements do not completely drop out of our analysis. The fact that a defendant initiated a prosecution illustrates the *type* of Fourth Amendment claim a plaintiff brings and the relevant constitutional standards that apply to that claim. Our precedent has long separated malicious-prosecution claims from false-arrest or imprisonment claims on the basis that malicious-prosecution seizures were made under legal process but false-arrest or imprisonment seizures were made without legal process. *See Williams*, 965 F.3d at 1157–58; *Whiting*, 85 F.3d at 585–86 & n.8. In other words, the initiation of a criminal prosecution plays only the "limited role," *Laskar*, 972 F.3d at 1293, of identifying the relevant constitutional principles at issue, *see Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330–31 (11th Cir. 2024) (discussing the differences between Fourth Amendment malicious-prosecution claims and Fourth Amendment false-arrest claims).

So that common-law element does not bar relief if a plaintiff otherwise states a Fourth Amendment violation under the applicable constitutional principles. *See Luke I*, 975 F.3d at 1144 (simplifying "our standard for malicious prosecution" to require proof "that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process," not proof that the defendant initiated a formal, criminal prosecution). After all, the Constitution, not the common law, controls the scope of an action under Section 1983.

> ii. *The common law did not limit malicious-prosecution actions to only those seeking redress for baseless criminal prosecutions.*

But even if the common law did control the scope of a claim under Section 1983 and the Fourth Amendment, Defendants still would not prevail. A plaintiff in Gervin's shoes could state a common-law claim of malicious prosecution because the tort provided redress for a diverse set of maliciously instituted suits and proceedings that resulted in a person's erroneous confinement.

The elements of malicious prosecution that the Court recounted in *Thompson* bear this out. A plaintiff could state a claim for malicious prosecution by showing that the defendant maliciously instituted or continued a "suit or proceeding." 596 U.S. at 44. "[S]uit or proceeding" is a pretty broad phrase. Indeed, at its most expansive, it includes any "steps or measures in the prosecution of an action." *Proceeding*, 2 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1828).

The breadth of that phrase comports with the injury the malicious-prosecution tort was supposed to remedy. It sought to stop "groundless proceedings" that could "affect[] materially one's standing and credit," COOLEY, *supra*, at 180, and that could cause "injury to the person, as connected with false imprisonment, and also to property, on account of the necessary cost and expense of defending against unfounded demands or accusations," 1 FRANCIS HILLARD, THE LAW OF TORTS OR PRIVATE WRONGS 475 (Boston, Little, Brown & Co. 2d ed. 1866); *see also id.* at 489 (explaining "the

plaintiff must allege and prove that he has been prosecuted by the defendant, either criminally or in a civil suit" (emphasis omitted)).

Many forms of suits and proceeding implicate these types of injuries. Even some civil actions may lead to confinement, *see Howard*, 25 F.4th at 911, and a person incurs costs in any type of litigation, *see Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (recognizing the litigation costs associated with civil suits); *cf. Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1417 (Fed. Cir. 2009) (discussing burdens of practicing before the USPTO). So it's unsurprising that courts understood the tort of malicious prosecution to offer redress for damage that non-criminal legal process inflicts. To be sure, around the time Congress enacted Section 1983, the authorities were "not entirely agreed [on] what cases [were] embraced within" the tort of malicious prosecution. COOLEY, *supra*, at 187–89. But one thing that was beyond question was that the tort could redress a wide array of baseless legal proceedings, civil and criminal alike, that could injure a person or her property. *See id.* at 187–89 (overviewing the scope of malicious-prosecution claims).

English courts established that principle well before the Revolution. *Chapman v. Pickersgill* offers a helpful example. There, a plaintiff sought redress for the false and malicious commission of a bankruptcy suit against him. (1762) 95 Eng. Rep. 734, 734; 2 Wils. K.B. 146, 146 (opinion of Pratt, C.J.). The defendant objected to the action on the grounds that the bankruptcy "was a proceeding in nature of a civil suit" and that such a malicious-prosecution claim had never been brought before. *Id.*

The court quickly rejected those arguments, adding that it "wish[ed] never to hear" them again.  *Id.*  Torts, the court explained, "are infinitely various, not limited or confined, for there is nothing in nature but may be an instrument of mischief." *Id.*  And "suing out a commission of bankruptcy falsely and maliciously, is of the most injurious consequence in a trading country." *Id.*  In fact, the plaintiff alleged as much.  He claimed he had been "greatly damaged," "scandalized upon record, and put to great charges in obtaining a supersedeas to the commission." *Id.*  So in approving of the plaintiff's action, the court made clear that "wherever there is an injury done to a man's property by a false and malicious prosecution, it is most reasonable he should have an action to repair himself." *Id.*

This governing principle held throughout the early nineteenth century.  English courts continued to sustain malicious-prosecution claims for baseless bankruptcy proceedings, *see, e.g.*, *Whitworth v. Hall* (1831) 109 Eng. Rep. 1302, 1303; 2 B. & Ad. 695, 697–98 (opinion of Tenterden, C.J.); *Farley v. Danks* (1855) 119 E.R. 180, 182; 4 El. & Bl. 493, 498–99; maliciously issued executions for sums larger than those actually due, *see, e.g.*, *Churchill v. Siggers* (1854) 118 Eng. Rep. 1389, 1392–93; 3 El. & Bl. 929, 937–40; *Jennings v. Florence* (1857) 140 Eng. Rep. 500, 501; 2 C. B. (N. S.) 467, 470–71; false suits for attachment or seizure of a person's property, *see, e.g.*, *Waterer v. Freeman* (1619) 80 Eng. Rep. 412, 412–13; Hobart 266, 266–67; and abuse of the civil process causing one's arrest, *see, e.g.*, *Grainger v Hill* (1838) 132 Eng. Rep. 769, 772–73; 4 Bing. (N. C.) 212, 219–21 (opinion of Tindal, C.J.); *Heywood v Collinge* (1838) 112 Eng. Rep.

1213, 1215–16; 9 Ad. & El. 268, 273–75. Lord Campbell aptly summarized the rule: "[t]o put into force the process of the law maliciously and without any reasonable or probable cause is wrongful." *Churchill*, 118 Eng. Rep. at 1392; 3 El. & Bl. at 937.

The law did not differ on our side of the pond. American courts readily adopted the general principles governing the tort of malicious prosecution that the English system refined in earlier centuries. *See, e.g.*, *White v. Dingley*, 4 Mass. 433, 435 (1808) (holding "[n]o action, by the common law, lies for damages sustained by suing a civil action, when the plaintiff fails, unless it be alleged and shown to be malicious, and without probable cause").

Americans could sue for damage that various types of proceedings caused: the malicious institution or continuation of bankruptcy proceedings, *see, e.g.*, *Stewart v. Sonneborn*, 98 U.S. 187, 192 (1878); executions for sums larger than was due, *see, e.g.*, *Sommer v. Wilt*, 4 Serg. & Rawle 19, 23 (Pa. 1818); *Savage v. Brewer*, 33 Mass. (16 Pick.) 453, 455–57 (1835); attachments, injunctions, or other restrictions on a person's use and enjoyment of property, *see, e.g.*, *Rogers v. Brewster*, 5 Johns. 125, 127 (N.Y. Sup. Ct. 1809); *Stone v. Swift*, 21 Mass. (4 Pick.) 389, 405, 409 (1826); *Cox v. Taylor's Adm'r*, 49 Ky. (10 B. Mon.) 17, 18 (1849); *Spengler v. Davy*, 56 Va. (15 Gratt.) 381, 395 (1859); *Fullenwider v. McWilliams*, 70 Ky. (7 Bush) 389, 390 (1870); suits to declare individuals insane and place them under guardianship, *see, e.g.*, *Davenport v. Lynch*, 51 N.C. (6 Jones) 545, 547 (1859); *Lockenour v. Sides*, 57 Ind. 360, 365 (1877); *cf. Johnson v. King & Davidson*, 64 Tex. 226, 231 (1885); and other civil actions leading

to a person's arrest, *see, e.g.*, *Watkins v. Baird*, 6 Mass. 506, 511 (1810); *Ray v. Law*, 20 F. Cas. 330, 330 (C.C.D. Pa. 1816) (No. 11,592) (Washington, Circuit Justice); *Burhans v. Sanford*, 19 Wend. 417, 417–18 (N.Y. Sup. Ct. 1838); *Burnap v. Marsh*, 13 Ill. 535, 537 (1852); *Beach v. Wheeler*, 30 Pa. 69, 69 (1858); *Collins v. Hayte*, 50 Ill. 337, 348 (1869).

In fact, Antebellum and Reconstruction jurists rejected arguments—just like the one Defendants now make—that courts should read the word "prosecution" "in its most restricted sense" and limit the tort "only to criminal proceedings." *Burnap*, 13 Ill. at 541; *see id.* at 540–42 (concluding the tort permits redress for past civil suits in which the plaintiff was maliciously arrested); *accord Lipscomb v. Shofner*, 33 S.W. 818, 819 (Tenn. 1896). Americans commonly used the terms "prosecution" and "[m]alicious *prosecution*" broadly, referring to the "institution and carrying on of a suit in a court of law or equity, to obtain some right, or to redress and punish some wrong." *Prosecution*, WEBSTER, *supra* (emphasis in original); *see also Prosecute*, WEBSTER, *supra* (defining "prosecute" as "[t]o seek to obtain by legal process," "[t]o accuse of some crime or breach of law, or to pursue for redress or punishment, before a legal tribunal").

And U.S. courts recognized, just as those in England did, that the "novelty" of a defendant's previous legal "action" could offer "no objection" to a plaintiff's malicious-prosecution claim because the relevant "injury consists in the oppression and the malice," not the form of the previous action itself. *Sommer*, 4 Serg. & Rawle at 23. It was the injury that the legal process caused, not the form of

that process, that gave rise to the "remedy" at law. *Id.*; *see Pangburn v. Bull*, 1 Wend. 345, 350–51 (N.Y. Sup. Ct. 1828) (concluding malicious-prosecutions claims "did not require an arrest or bail" because other forms of legal process may give rise to damages "equally great").

To be sure, that plaintiffs could seek redress for many abuses of the legal process did not mean courts treated all alleged malicious prosecutions equally. *See Howard*, 25 F.4th at 911–12. Of course, some courts ignored whether the dispute concerned a previous civil or criminal case. *See, e.g.*, *Stewart*, 98 U.S. at 192 ("Notwithstanding what has been said in some decisions of a distinction between actions for criminal prosecutions and civil suits, both classes at the present day require substantially the same essentials."); *Collins*, 50 Ill. at 354 ("Although this prosecution was to recover damages for a private wrong . . . it is governed by rules of law precisely the same, had the prosecution been of a criminal character."). But others recognized "a distinction between . . . civil suits . . . prosecuted for the private benefit of the plaintiff and a malicious prosecution of an offense . . . which affects the public." *Adams v. Lisher*, 3 Blackf. 241, 244 (Ind. 1833); *see* COOLEY, *supra*, at 185 (discussing the distinction).

The law in the jurisdictions that distinguished between the two "favoured" the "prosecutor" by preventing a plaintiff from relying on the prosecuting attorney's ill-founded "private motive[s]," *Adams*, 3 Blackf. at 244, or by "departing from the ordinary rules of pleading and proof, and imposing upon" a plaintiff "the burden of

negativing probable cause as the foundation of the prosecution," *Spengler*, 56 Va. (15 Gratt.) at 390. *Compare Grant v. Deuel*, 3 Rob. 17, 20 (La. 1842) (requiring, for malicious criminal prosecutions, "positive evidence . . . that the prosecution was groundless"), *with Burhans*, 19 Wend. at 418 (holding proof that defendants voluntarily discontinued a suit for slander "was sufficient to change the *onus*, and throw upon the defendants the necessity of showing probable cause").

Still, of the possible distinctions between malicious-prosecution claims premised on baseless civil and criminal suits, none appear to have gone to the facial viability of a plaintiff's case. In other words, the form of the proceeding the defendant instituted or continued was not inherently relevant. *See Kryszke v. Kamin*, 163 Mich. 290, 299 (1910) ("The name or form of the writ or process is immaterial."). Rather, the nature of the damages the plaintiff suffered supplied the limiting principle, to the extent one existed: courts would not entertain malicious-prosecution suits premised on prior legal proceedings when the usual rules of cost-shifting adequately compensated a plaintiff for the damage of defending the baseless suit.

We can trace this throughline back to the thirteenth century. The earliest iterations of the common law guaranteed individuals access to the King's courts. But the courts discouraged unfounded litigation through sureties, pledges of prosecution, and

23-11452                Opinion of the Court                33

amercement.[11] *See* Note, *Groundless Litigation and the Malicious Prosecution Debate: A Historical Analysis*, 88 Yale L.J. 1218, 1221–27 (1979) [hereinafter *Groundless Litigation*] (recounting the precursors to malicious-prosecution claims); *see also* John D. Lawson, *The Action for the Malicious Prosecution of a Civil Suit*, 30 AM. L. REG. 281, 282–83 (1882).

Over time, though, these remedies proved ineffective against mounting waves of false suits. So starting in 1267 with the Statute of Marlborough,[12] Parliament legislated rules that ensured successful parties in a suit would recover their litigation costs. *Groundless Litigation*, *supra*, at 1226–27; *see id.* at 1226 n.64 (collecting statutes). These statutes abated the concern that a plaintiff needed a later civil action to obtain redress. *See* Lawson, *supra*, at 283; *Torts—Malicious*

---

[11] "Amercements were payments to the Crown, and were required of individuals who were 'in the King's mercy,' because of some act offensive to the Crown." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 269 (1989). Vexatious litigation fell among the acts "offensive to the Crown." *See Groundless Litigation*, *supra*, at 1222–24.

[12] Although case law and legal literature commonly refer to this statute as canonical in the development of the tort of malicious prosecution, it goes by many names. Some have called it the Statute of Marleberge. *See, e.g., Groundless Litigation*, *supra*, at 1223 n.40. Others, the Statute of Marlbridge. *See, e.g., Whipple v. Fuller*, 11 Conn. 582, 585 (Conn. 1836). But we use the moniker that official U.K. sources have adopted, the Statute of Marlborough. *See The Statute of Marlborough 1267 [Distress]*, THE NATIONAL ARCHIVES, https://www.legislation.gov.uk/aep/Hen3cc1415/52/1 [https://perma.cc/7PCF-MYFW] (discussing The Statute of Marlborough 1267, 52 Hen. 3 c. 6, § 2 (Eng.)).

*Prosecution—Civil Action—Absence of Interference with Person or Property*, 30 Yale L.J. 310, 310 (1921).

And in turn, to maintain a suit for malicious prosecution, English courts required a showing of special damages apart from those curable through an award of costs. *See, e.g.*, *Waterer*, 91 Eng. Rep. at 413; Hobart at 267; *Savile v. Roberts* (1698) 91 Eng. Rep. 1147, 1551; 1 Ld. Raym. 374, 381; *Parker v. Langley* (1713) 93 Eng. Rep. 293, 294; Gilb. Cas. 163, 164–67; *Cotterell v Jones* (1851) 138 Eng. Rep. 655, 661; 11 C. B. 713, 727–29 (opinion of Jervis, C.J.); *id.* at 662; 11 C. B. at 730–31 (opinion of Talfourd, J.).

This history greatly influenced the scope of malicious-prosecution claims in American courts. Many courts adopted this so-called "English rule" and required special damages to sustain a malicious-prosecution action.

These courts held that in the absence of an arrest, of a seizure, attachment, or interference with property, or of other consequential damages, such as damage to reputation, a successful defendant has no remedy, even when an antagonist proceeded against him maliciously and without probable cause. *See, e.g.*, *Thomas v. Rouse*, 4 S.C.L. (2 Brev.) 75 (1806); *Potts v. Imlay*, 4 N.J.L. 330, 334 (1816) (opinion of Kirkpatrick, C.J.); *Cade v. Yocum*, 8 La. Ann. 477, 478 (1852); *Gorton v. Brown*, 27 Ill. 489, 494 (1862); *Mayer v. Walter*, 64 Pa. 283, 289 (1870); *Salado Coll. v. Davis*, 47 Tex. 131, 136 (1877); *McNamee v. Minke*, 49 Md. 122, 133–34 (1878); *Wetmore v. Mellinger*, 18 N.W. 870, 871 (Iowa 1884); *Mitchell v. Sw. R.R.*, 75 Ga. 398, 404–05 (1885); *Ely v. Davis*, 15 S.E. 878, 878 (N.C. 1892); *Mitchell v. Silver*

*Lake Lodge No. 84, I.O.O.F.*, 29 Or. 294, 297 (1896); *cf. Tomlinson v. Warner*, 9 Ohio 103, 104–05 (1839) (favoring the English rule in dicta), *limited as dicta in Pope v. Pollock*, 21 N.E. 356, 357 (Ohio 1889) (disfavoring the English rule in dicta); *Rice v. Day*, 51 N.W. 464, 465 (Neb. 1892) (adopting the English rule), *overruled by McCormick Harvester Mach. Co. v. Willan*, 88 N.W. 497, 497–98 (Neb. 1901) (rejecting the English rule).[13]

But many others rejected this "English rule." Instead, these courts credited the "principle" that was "operative" throughout common-law jurisprudence: plaintiffs may state a claim for

---

[13] Because the issue of damages is not before us, we do not now rule on the full extent of damages recoverable in a Fourth Amendment malicious-prosecution action. Still, we do not imply that jurisdictions adopting the special-damages requirement precluded recovery of all litigation expenses. It appears that, in some of the states that rejected the English rule, as well as those that did not specifically address the English rule, around the time Congress enacted Section 1983, plaintiffs could still recover some litigation expenses incurred in defending the original, malicious prosecution. *See, e.g., Littlejohn v. Wilcox*, 2 La. Ann. 620, 620 (1847); *Barnett v. Reed*, 51 Pa. 190, 191, 193, 196 (1865); *Lawrence v. Hagerman*, 56 Ill. 68, 76 (1870); *Bonesteel v. Bonesteel*, 30 Wis. 511, 515–16 (1872); *Cooper v. Utterbach*, 37 Md. 282, 287, 299, 315–16 (1873); *Krug v. Ward*, 77 Ill. 603, 609 (1875); *Stewart*, 98 U.S. at 190–91, 197; *Coleman v. Allen*, 79 Ga. 637, 640, 647 (1888); *Slater v. Kimbro*, 91 Ga. 217, 18 S.E. 296, 297 (1892); *Hurlbut v. Boaz*, 4 Tex. Civ. App. 371, 377 (1893); *Rule v. McGregor*, 88 N.W. 814, 814 (Iowa 1902); *Stanford v. A. F. Messick Grocery Co.*, 55 S.E. 815, 817–18 (N.C. 1906); *see also Parsons v. Harper*, 57 Va. (16 Gratt.) 64, 73–74, 78 (1860); *Lavender v. Hudgens*, 32 Ark. 763, 770–71 (1878); *Vinal v. Core*, 18 W. Va. 1, 3, 8, 48–50 (1881); *Wheeler v. Hanson*, 161 Mass. 370, 376 (1894); *Blunk v. Atchison, T. & S.F.R. Co.*, 38 F. 311, 317 (C.C.W.D. Mo. 1889); *Hewellette v. George*, 9 So. 885, 887 (Miss. 1891), *overruled on other grounds by Glaskox ex rel. Denton v. Glaskox*, 614 So. 2d 906 (Miss. 1992).

malicious prosecution when "taxation of costs is not an ample remedy." *Whipple v. Fuller*, 11 Conn. 582, 585 (1836); *see, e.g., Pangburn*, 1 Wend. at 350–54; *Closson v. Staples*, 42 Vt. 209, 215–22 (1869); *Marbourg v. Smith*, 11 Kan. 554, 564 (1873); *Woods v. Finnell*, 76 Ky. (13 Bush) 628, 633–35 (1878); *McCardle v. McGinley*, 86 Ind. 538, 540–41 (1882) (citing *Lockenour*, 57 Ind. at 364–65); *Eastin v. Bank of Stockton*, 66 Cal. 123, 126–27 (1884); *McPherson v. Runyon*, 41 Minn. 524, 525 (1889); *Antcliff v. June*, 81 Mich. 477, 490 (1890) (citing *Brand v. Hinchman*, 68 Mich. 590, 597 (1888)); *Smith v. Burrus*, 16 S.W. 881, 881–82 (Mo. 1891) (citing *Brady v. Ervin*, 48 Mo. 533, 534–35 (1871)); *Lipscomb*, 33 S.W. at 818–19; *Kolka v. Jones*, 71 N.W. 558, 559 (N.D. 1897); *cf. Marshall v. Betner*, 17 Ala. 832, 837 (1850) (allowing recovery of litigation expenses on reasoning that rejects the English rule); *Hoyt v. Macon*, 2 Colo. 113, 116–17, 119–21 (1873) (same); *Pope*, 21 N.E. at 357 (disfavoring the English rule in dicta).

And in the United States, cost awards were often insufficient to make prevailing defendants whole. *See Masterson v. Brown*, 72 F. 136, 138 (5th Cir. 1896) (concluding "no similar or equivalent provisions for adjudging costs are of force in any of the different states").[14]  States' cost-shifting statutes "were not intended or supposed to be an adequate compensation for all damages [a litigant] might sustain and should recover by reason of defending a suit

---

[14] All decisions that the Fifth Circuit issued by the close of business on September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

which was brought and prosecuted maliciously and without probable cause." *Closson*, 42 Vt. at 221.

In fact, courts remarked that it was "too clear for discussion that the costs which the law gives a successful party are no adequate compensation for the time, trouble and expense of defending a malicious and groundless civil action." *McCardle*, 86 Ind. at 540; *see Kolka*, 71 N.W. at 560 ("That our meager bill of costs was intended to recompense the victim of the malicious prosecution of a civil suit is, to our minds, unthinkable."). So in refusing to "shut [their] eyes to the truth known by every body," *Whipple*, 11 Conn. at 585, many states enabled plaintiffs to bring malicious-prosecution claims by alleging the actual "expenses incurred and damages sustained" in defending baseless suits, *Woods*, 76 Ky. (13 Bush) at 633 (concluding litigation expenses "should be as fully recognized as if his property had been attached or his body taken charge of by the sheriff"); *see* COOLEY, *supra*, at 188–89, 188 n.3 (listing cases but disfavoring the rule). And under that rule, courts considered routine yet baseless and malicious civil suits to amount to tortious conduct.

"In the light of this history, we have no trouble discerning a well-settled principle of law to guide our analysis." *Laskar*, 972 F.3d at 1289. Many forms of legal process may give rise to a common-law claim for malicious prosecution. The limiting principle is the plaintiff's injury, not the civil or criminal nature of the legal process the defendant previously instituted or continued. So as long as the plaintiff proved the acceptable type of damages the relevant

jurisdiction required, plaintiffs could maintain a suit for malicious prosecution. In many cases, any unremedied damage—even litigation costs alone—sufficed. But in others, plaintiffs had to prove special damages, like reputational harm, attachment of property, or an arrest of their person. *See McNamee*, 49 Md. at 133–34.

For our purposes, though, in *every* jurisdiction, a plaintiff in Gervin's shoes could state a claim for malicious prosecution. An arrest and corresponding bodily confinement gave rise to the special damages that even stringent jurisdictions demanded. *See Howard*, 25 F.4th at 911 (linking "a criminal prosecution" with "a civil action that resulted in an arrest"); HILLARD, *supra*, at 475 (discussing "injury to the person, as connected with false imprisonment, and also to property"); *Burnap*, 13 Ill. at 540–41 (confirming the term malicious prosecution "has been often used by learned courts and elementary writers as applying to prosecutions of civil suits, in which the party has been maliciously arrested"); *see also Mitchell*, 75 Ga. at 405 (requiring that the "person of the defendant was arrested, or his property attached, or any special grievance to defendant").

And the more permissive jurisdictions also recognized that a cost-shifting statute could not remedy damages stemming from a person's seizure. *See Closson*, 42 Vt. at 219 ("arresting the body" may "enhance[]" damages but it is "not essential to maintain an action"); *accord Pangburn*, 1 Wend. at 350–51; *Whipple*, 11 Conn. at 584–85; *Marbourg*, 11 Kan. at 564; *Woods*, 76 Ky. (13 Bush) at 632, 635. So the common law would have permitted Gervin's suit. For

that reason, Defendants cannot now resist his Fourth Amendment claim on that basis.

★   ★   ★

To recap, the district court correctly concluded that a reasonable jury could find that Defendants violated Gervin's Fourth and Fourteenth Amendment rights. When we construe the evidence in the light most favorable to Gervin, Florence and Milton used the legal process to seize Gervin and continually detain him; those proceedings terminated in Gervin's favor; and, aside from the legal process used to seize Gervin, nothing could constitutionally justify Gervin's arrest and detention.

On top of that, Gervin presented enough evidence to allow a jury to conclude that the legal process justifying his seizure was constitutionally infirm. When we again view the evidence in the light most favorable to Gervin, the warrant application Florence submitted, the probation-revocation petition Milton filed, and the testimony Milton gave at the probation-revocation hearing included false statements and material omissions about the conditions of probation that applied to Gervin. And both Florence and Milton had easy access to, and said they reviewed, definitively exculpatory information (Gervin's sentencing form). So a jury could reasonably conclude the pair made false statements and material omissions recklessly. Under our precedent, Gervin has made out a viable Fourth Amendment malicious-prosecution claim.

Neither Gervin's status as a probationer nor the probation-based nature of the legal proceedings that resulted in Gervin's

seizure undermines that conclusion.  The Fourth Amendment's protections don't depend on the character of the legal process causing a seizure.  Indeed, the Fourth Amendment's text, as well as our precedent, make that clear.  And the common-law background against which Congress enacted Section 1983 confirms what we glean from the Constitution's text.  A plaintiff could state a claim for malicious prosecution, even if the previous prosecution was civil in nature, if it led to the plaintiff's arrest.  So we reject Defendants' argument that probation-revocation proceedings are not prosecutions within the scope of Gervin's Section 1983 claim.

With that settled, we consider Defendants' claim of qualified immunity.

B.  *Gervin premises his Fourth Amendment malicious-prosecution claim on clearly established law, so Defendants are not entitled to qualified immunity.*

Qualified immunity attempts to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009).  To accomplish these dual goals, the doctrine protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).  The "clearly established" requirement shields from liability "all but the plainly incompetent

or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

Three limitations on the legal authorities that plaintiffs may use to advance their claims ensure that the governing law is, in fact, "clearly established" before a plaintiff may avoid a qualified-immunity defense: the substance of the law on which the plaintiff may rely, the jurisdiction of the case law the plaintiff may invoke, and the timing of the issuance of that case law. Each of these limitations contributes to providing defendants with notice of the governing law.

First, we limit the substance of the law a plaintiff may use: he "must point to (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)).

Second, we limit the jurisdictions from which a plaintiff may identify applicable law: the plaintiff must point "to binding decisions of the Supreme Court of the United States, this Court, [or] the highest court of the relevant state" (here, Georgia). *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018). Other

jurisdictions' precedent cannot clearly establish the law in our Circuit. *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).[15]

And third, we limit the timing of the relevant case law: plaintiffs may rely on only the case law issued at the time of the official's act, not on law that developed later. *Harlow*, 457 U.S. at 818. After all, "[i]f objective observers cannot predict—at the time the official acts—whether the act was lawful or not, and the answer must await full adjudication in a district court years in the future, the official deserves immunity from liability for civil damages." *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996).

Under these principles, Defendants are not entitled to qualified immunity.

We start with Florence, who filed the 2012 warrant application that led to Gervin's arrest. We've already explained that officials violate clearly established Fourth Amendment law "if they knowingly or recklessly make 'false statements in an arrest affidavit about the probable cause for an arrest in order to detain a citizen . . . if such false statements were necessary to the probable

---

[15] We are currently considering en banc whether to overrule our precedent and to allow plaintiffs to defeat qualified immunity by relying on a robust consensus of cases of persuasive authority. *See Gilmore v. Ga. Dep't of Corr.*, 111 F.4th 1118, 1135–36 (11th Cir.), *reh'g en banc granted, opinion vacated*, 119 F.4th 839 (11th Cir. 2024). For the reasons we explain below, our resolution of *Gilmore* does not impact the outcome of this dispute; controlling Supreme Court authority and the law of this Circuit clearly established the alleged constitutional violations here.

cause.'" *Laskar*, 972 F.3d at 1297 (alteration in original) (quoting *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999)).

So when we draw all factual inferences in Gervin's favor, as we did in the discussion in the last section, Florence's liability "follows immediately from the conclusion that the right was firmly established." *Id.* (cleaned up) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). Because Florence did not assert (and the record did not show) that Gervin violated his only actual probation condition, Florence did not even have "'arguable' probable cause," *Grider v. City of Auburn*, 618 F.3d 1240, 1257 & n.25 (11th Cir. 2010), or arguable reasonable suspicion, *cf. Chandrasuwan*, 820 F.3d at 696, that Gervin violated his probation. And that means she does not enjoy qualified immunity.

The same goes for Milton. Officers "cannot intentionally or recklessly make material misstatements or omissions in later testimony to continue detention." *Howard*, 25 F.4th at 907 (citing *Manuel*, 580 U.S. at 369 n.8). Nor can they rely on an "invalid charge . . . to continue" a detention. *Chiaverini v. City of Napoleon*, 602 U.S. 556, 563 (2024) (citing *Rodriguez v. United States*, 575 U.S. 348, 354–57 (2015)); *see Wood*, 323 F.3d at 882 (holding that "a criminal prosecution . . . continued . . . without probable cause" can violate the Fourth Amendment).

The Supreme Court held as much in 2017, when it concluded that "tainted" legal process—by "fabricated evidence," for instance—may result in a Fourth Amendment violation, "[w]hatever [the] precise form" of the tainted "proceeding." *Manuel*, 580

U.S. at 369 n.8. So if a jury finds that Milton continued Gervin's 2019 detention by recklessly making material misstatements or omissions in the probation-revocation petition or at the probation-revocation hearing, she violated Gervin's clearly established constitutional rights.

That much really isn't up for dispute. Instead, Defendants suggest we should award them qualified immunity because, at the time of their relevant conduct, we had not "specifically addressed whether a probation violation is a 'criminal prosecution' for purposes of a § 1983 claim for malicious prosecution." *Smith v. Mitchell*, 856 F. App'x 248, 250 (11th Cir. 2021). We are not persuaded.

Since the inception of our Fourth Amendment malicious-prosecution case law, we have confirmed that the nature of the legal process causing a seizure is irrelevant to whether a plaintiff may state a Fourth Amendment violation and, therefore, a Section 1983 claim. "Our oldest decisions on the subject explained that 'malicious prosecution' is only a 'shorthand way of describing' certain claims for unlawful seizure, not an 'independent Fourth Amendment right . . . to be free from a malicious prosecution.'" *Laskar*, 972 F.3d at 1294 (quoting *Whiting*, 85 F.3d at 584). So, we've held, to "avoid an order of dismissal," a plaintiff need only "base[] his claim—whatever he calls it—on some actual unlawful, forcible, restraint of his person." *Whiting*, 85 F.3d at 584; *see also Kelly*, 21 F.3d at 1553–55 (reviving a claim of malicious prosecution under the Fourth Amendment without considering whether the plaintiff satisfied the common-law elements). And here, Gervin does just that.

Plus, even under the line of cases on which Defendants rely, Gervin could still prove "the elements of the common law tort of malicious prosecution." *Wood*, 323 F.3d at 881. True, our precedent relied on a Georgia statute authorizing malicious-prosecution suits premised on prior "criminal prosecution[s]." *Uboh*, 141 F.3d at 1004 (quoting O.C.G.A. § 51–7–40); *see also Wood*, 323 F.3d at 881–82 (quoting *Uboh*, 141 F.3d at 1004); *Paez*, 915 F.3d at 1285 (quoting *Wood*, 323 F.3d at 882); *Williams*, 965 F.3d at 1157 (quoting *Paez*, 915 F.3d at 1285); *Butler*, 85 F.4th at 1111 (same). But that fact does not suggest Defendants could not violate the Fourth Amendment through civil proceedings.

Before Florence's and Milton's relevant conduct, the Supreme Court clearly established that the common law of 1871 controls the scope of a Section 1983 claim. *See Kalina v. Fletcher*, 522 U.S. 118, 123 (1997) (concluding that Section 1983 must be "construed in the light of common-law principles that were well settled at the time of its enactment"). So the "the elements of the common law tort of malicious prosecution," *Wood*, 323 F.3d at 881, that Gervin must prove are those of the tort as it existed around the time Section 1983 was enacted, *see Laskar*, 972 F.3d at 1294 (citing *Kalina*, 522 U.S. at 123); *Williams*, 965 F.3d at 1157, not as Georgia codified it into statutes at the turn of the twenty-first century, *cf. Uboh*, 141 F.3d at 1004 (relying on Georgia statutory law).

And as we've explained, the common law of that period did not limit malicious-prosecution claims to redress for wrongful criminal prosecutions. In fact, we recognized more than a century

ago that a person may state a common-law claim for malicious prosecution if someone abused civil process to "maliciously arrest[] another." *Masterson*, 72 F. at 140; *see also Mitchell*, 75 Ga. at 405 ("[W]hen an action was sued out maliciously and without probable cause, whereby the person of the defendant was arrested . . . , then in such a case the action would lie.").

To translate these points back into the language of our qualified-immunity precedent, two "broad statement[s] of principle within" our "case law," *Crocker*, 995 F.3d at 1240, independently refute the suggestion that Gervin may not state a Fourth Amendment claim because the legal process causing his arrest and continued detention were probation-revocation proceedings. First, it's well established that "the Fourth Amendment protects against 'searches' and 'seizures' (and not 'prosecutions')." *Whiting*, 85 F.3d at 584. And Defendants' conduct caused Gervin to be seized and detained for several months. Second, the Supreme Court has long held that the common law of 1871, not today, helps define Section 1983 claims. *Kalina*, 522 U.S. at 123. And the law at that time was unanimous that both criminal and civil proceedings leading to an arrest were tortious conduct remedied by malicious-prosecution claims. *See Masterson*, 72 F. at 140; *Kolka*, 71 N.W. at 559 (surveying nineteenth-century case law).

Given these two principles, any reasonable officer would know that a seizure that was constitutionally infirm because it was secured through false or misleading evidence would create damages liability "no matter what kind of" legal process led to that

seizure. *See Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1325 (11th Cir. 2024); *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) (confirming "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful'" (cleaned up)).  So Florence and Milton do not enjoy qualified immunity.

## IV.    CONCLUSION

For the reasons we've discussed, we affirm the district court's partial denial of Defendants' motion for summary judgment and remand the case for further proceedings consistent with this opinion.

**AFFIRMED AND REMANDED.**

23-11452            WILSON, J., Concurring                1

WILSON, Circuit Judge, joined by ABUDU, Circuit Judge, Concurring:

I agree with the majority's holding that, viewing the evidence in the light most favorable to DeShawn Gervin, his claim under 42 U.S.C. § 1983 for a violation of his Fourth Amendment rights should survive summary judgment. I also agree that the Probation Officer Defendants cannot claim qualified immunity. But I concur only after reckoning with a body of Supreme Court and Eleventh Circuit precedent that may, at first glance, seem to dictate a different result. In the end, however, a deeper review of Fourth Amendment precedent directs the proper outcome here.

The Fourth Amendment protects against unreasonable seizures both "before the formal onset of a criminal proceeding" and "when legal process itself goes wrong." *Manuel v. City of Joliet*, 580 U.S. 357, 359 (2017). To make out a claim based on an unreasonable seizure pursuant to legal process, plaintiffs must prove both the elements of the common-law tort of malicious prosecution and show a violation of their Fourth Amendment rights. *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023). We have repeatedly, but not exclusively, listed "'a criminal prosecution instituted or continued by the present defendant'" as the first element of the malicious prosecution tort. *E.g.*, *id.* (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019)); *see also Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018). *But see Thompson v. Clark*, 596 U.S. 36, 44 (2022) (describing the first element of the malicious prosecution tort as "the suit or proceeding was 'instituted without any probable cause'"); *Sylvester*

*v. Fulton Cnty. Jail*, 94 F.4th 1324, 1329 (11th Cir. 2024) (listing elements for a Section 1983 malicious prosecution claim as "(1) the legal process justifying the plaintiff's seizure was constitutionally infirm, (2) the seizure would not otherwise be justified without legal process, and (3) the criminal proceedings against the plaintiff terminated in his favor" (alterations adopted and internal quotation marks omitted)); *Luke v. Gulley*, 50 F.4th 90, 95 (11th Cir. 2022) (per curiam) (same).

The Probation Officers argue that Gervin's claim fails because he cannot establish that there was a "criminal prosecution" instituted against him. And precedent initially seems to back them up. Cases from the Supreme Court and the Eleventh Circuit state that the revocation of parole or probation is "'not a stage of a criminal prosecution.'" *United States v. Dennis*, 26 F.4th 922, 927 (11th Cir. 2022) (quoting *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973)); *see also Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) ("[T]he revocation of parole is not part of a criminal prosecution . . . ."). At first glance, the inquiry ends here. Gervin's claim derives from his detention for probation revocation and probation revocation is not part of a criminal prosecution, so he cannot meet the first element of his claim. But it is worth taking a closer look.

To start, the Supreme Court has never suggested that people on probation or parole lose their Fourth Amendment rights. To be sure, states can require probationers or parolees to agree to warrantless searches as a condition of release. *See Samson v. California*, 547 U.S. 843, 846 (2006); *United States v. Knights*, 534 U.S. 112, 122

(2001); *Owens v. Kelley*, 681 F.2d 1362, 1366 (11th Cir. 1982). But without such laws or agreements, "[t]here is no question that the Fourth Amendment's protection against unreasonable searches and seizures applies to probationers." *Owens*, 681 F.2d at 1367 (citing *Morrisey*, 408 U.S. at 471).

The foundational Supreme Court cases that held that defendants facing probation and parole revocations were not guaranteed the full suite of constitutional protections afforded to defendants in criminal prosecutions recognized the same. In *Morrissey*, the Court considered what process is due before revoking parole. 408 U.S. at 480–81. It reasoned that the liberty retained by a parolee, albeit "[s]ubject to the conditions of his parole," still "must be seen as within the protection of the Fourteenth Amendment." *Id.* at 482. Even though "revocation of parole is not part of a criminal prosecution" such that "the full panoply of rights due a defendant in such a proceeding does not apply," the Court still contemplated that "probable cause or reasonable ground" would be required to sustain an arrest for "violation of parole conditions." *Id.* at 480, 485.

Soon after, the Court recognized the same—that probable cause would be required to sustain an "arrest and detention" for a violation of conditions of release—for probation. *Gagnon*, 411 U.S. at 781–82. These two cases show that while the process due in revocation hearings might not include every constitutional protection for criminal prosecutions, like the right to counsel, due process still requires a determination that the arrest was supported by probable cause. And because the Court requires such a determination, it

follows that probationers and parolees retain Fourth Amendment protections against arrests made without probable cause.

Additionally, nearly all[1] of the cases addressing which constitutional protections apply in parole or probation revocations after *Morrissey* and *Gagnon* considered which of the Fifth and Sixth Amendment rights in criminal trials extend to revocation hearings. *See* Maj. Op. at 20 n.8 (collecting cases). This distinction—Fourth Amendment versus Fifth or Sixth Amendment—matters because, as the Majority Opinion rightly explains, "the Fourth Amendment is different." Maj. Op. at 19. Fifth and Sixth Amendment protections attach during "criminal case[s]," U.S. Const. amend. V., and "criminal prosecutions," *id.* amend. VI.[2] It makes sense that if revocations are not part of the criminal proceedings, the constitutional

---

[1] In *Pennsylvania Board of Probation & Parole v. Scott*, the Supreme Court held that the exclusionary rule does not apply in parole revocation hearings. 524 U.S. 357, 359 (1998). Although the rule operates by excluding evidence obtained in violation of the Fourth Amendment, it is a judicially created rule that, unlike the Fourth Amendment, does not "extend . . . beyond the criminal trial." *Id.* at 363–64.

[2] The Fifth and Sixth Amendments apply at "critical stages" of the prosecution, or "pretrial procedures that would impair defense on the merits if the accused [were] required to proceed without counsel." *Gerstein v. Pugh*, 420 U.S. 103, 122 (1975). The "adversary safeguards" provided by the Fifth and Sixth Amendments "are not essential for the probable cause determination required by the Fourth Amendment." *Id.* at 120. Not because it is not a criminal proceeding, but because "[i]n most cases, however, their value would be too slight to justify holding, as a matter of constitutional principle, that these formalities and safeguards designed for trial must also be employed in making the Fourth Amendment determination of probable cause." *Id.* at 122.

rights that attach during criminal trials would not be due. But the Fourth Amendment is not restrained to criminal cases and prosecutions in the same way; it applies broadly to all "unreasonable searches and seizures" not supported by "probable cause." *Id.* amend. IV. Looking to the *Morrissey* and *Gagnon* line of reasoning on the Fifth and Sixth Amendments to limit what counts for Fourth Amendment protection would be no wiser than trying to fit a square peg in a round hole.

Because people on parole and probation retain Fourth Amendment rights, they should be able to bring a Section 1983 claim when those rights are violated, such as when they are unlawfully seized without probable cause. Other Supreme Court precedent referencing the Fourth Amendment as a pretrial right does not change this conclusion, even though parole and probation "arise[] after the end of the criminal prosecution." *Gagnon*, 411 U.S. at 781 (quoting *Morrissey*, 408 U.S. at 480).

For example, in *Albright v. Oliver*, the four-Justice plurality referenced the Fourth Amendment as addressing "pretrial deprivations of liberty." 510 U.S. 266, 274 (1994) (plurality opinion). But it did so in a much different context—considering whether to recognize a Fourteenth Amendment substantive due process right to be free of prosecution without probable cause. *Id.* at 268. In the process of rejecting such a right based on substantive due process, the plurality suggested that the plaintiff's claim would instead have to be judged under the Fourth Amendment because there was a seizure. *Id.* at 271 (plurality opinion). It also more generally "noted

the Fourth Amendment's relevance to the deprivations of liberty"
and "to any extended restraint on liberty," which often "go hand in
hand with criminal prosecutions" but also occur "following an ar-
rest." *Id.* (plurality opinion) (citing *Gerstein v. Pugh*, 420 U.S. 103,
114 (1975)). With arrest, or "seizure," as the touchstone, *Albright*
supports the availability of the Section 1983 claim in Gervin's case.

 The Court similarly referenced the Fourth Amendment's
application to "pretrial confinement" in *Manuel*, 580 U.S. at 360.
There, the Court held that a criminal defendant could challenge his
pretrial detention, not just his arrest, even after a judge made a find-
ing of probable cause. *Id.* at 360–62. And *Manuel*'s holding, "that the
Fourth Amendment governs a claim for unlawful *pretrial* detention
even beyond the start of legal process," *id.* at 369–70 (emphasis
added), makes sense in the context of the case. The plaintiff alleged
he was wrongfully held on criminal charges before trial based on
fabricated evidence. *Id.* at 362. The Court had no occasion to con-
sider other situations, like probation revocation. And the broader
Fourth Amendment principles sketched by the *Manuel* Court
equally encompass Gervin's situation. As the Court explained:

> The Fourth Amendment prohibits government offi-
> cials from detaining a person in the absence of proba-
> ble cause. That can happen when the police hold
> someone without any reason before the formal onset
> of a criminal proceeding. But it also can occur when
> legal process itself goes wrong—when, for example, a
> judge's probable-cause determination is predicated
> solely on a police officer's false statements. Then, too,
> a person is confined without constitutionally

23-11452                WILSON, J., Concurring                7

adequate justification. Legal process has gone forward, but it has done nothing to satisfy the Fourth Amendment's probable-cause requirement. And for that reason, it cannot extinguish the detainee's Fourth Amendment claim . . . .

*Id.* at 367 (citation omitted).

The references to the Fourth Amendment as a "pretrial" right do not foreclose the application of the Fourth Amendment to arrests for probation revocation. Indeed, the Fourth Amendment seems to require us to recognize a Section 1983 claim because Gervin was arrested and detained "without constitutionally adequate justification." *Id.* This approach is faithful to *Albright* and *Manuel*'s recognition that the Fourth Amendment prohibits detaining a person without probable cause. *See id.*; *Albright*, 510 U.S. at 274. It also adheres to *Morrissey* and *Gagnon*'s recognition that "probable cause or reasonable ground" still must justify an arrest for "violation of parole conditions." *Morrissey*, 408 U.S. at 485; *see also Gagnon*, 411 U.S. at 781–82.

Finally, it bears repeating: the term "malicious prosecution" is a bit of a misnomer. *See* Maj. Op. at 21–24. "A claim of malicious prosecution under the Fourth Amendment is only 'shorthand' for a claim of deprivation of liberty pursuant to legal process . . . ." *Laskar v. Hurd*, 972 F.3d 1278, 1292 (11th Cir. 2020) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1157–59 (11th Cir. 2020)); *accord Thompson*, 596 U.S. at 42. When analyzing these claims, we look to "whether the seizure was justified, not whether the prosecution itself was justified." *Laskar*, 972 F.3d at 1292. After all, the Fourth

8                    WILSON, J., Concurring                    23-11452

Amendment prohibits unreasonable "searches and seizures," not unreasonable "prosecutions." We need not allow a claim's nickname to dictate its substance.

Because Supreme Court and Eleventh Circuit precedent support the availability of a Section 1983 claim in Gervin's case, I concur.